THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. DEREK M. LUEDEMANN, Defendant-Appellee.—THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. DEREK M. LUEDEMANN, Defendant-Appellee.

Second District   Nos. 2—03—1303, 2—04—0184 cons.

Opinion filed May 4, 2005.—Rehearing denied June 1, 2005.

413

O'MALLEY, P.J., dissenting.

John A. Barsanti, State's Attorney, of St. Charles (Martin P. Moltz and Gregory L. Slovacek, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Lisa F. Napier, of McNamee, Mahoney & Leach, Ltd., of Dundee, for appellee.

JUSTICE GROMETER delivered the opinion of the court:

Early on a Saturday morning in August 2002, defendant, Derek M. Luedemann, was sitting in his car in front of his girlfriend's house, waiting for her to return home. Officer Eric Pate drove by, noticing that defendant's car was running and he was smoking in the car. Officer Pate drove past defendant, parked in the middle of the street, approached defendant, and observed that defendant was intoxicated. Defendant was subsequently arrested for driving while under the influence of alcohol (DUI) (625 ILCS 5/11—501(a)(2) (West 2002)), in case No. 02—DT—1233 (the DUI case). Following this arrest, defendant's car was searched. A substance containing a methylenedioxy amphetamine derivative was found in the car, leading to defendant's indictment for unlawful possession of a controlled substance (720 ILCS 570/402(c) (West 2002)), in case No. 02—CF—1904 (the controlled substances case). In both cases, defendant moved to quash his arrest and suppress the evidence seized (725 ILCS 5/114—12 (West 2002)), arguing that Officer Pate lacked a reasonable

belief that defendant was involved in criminal activity. The trial court in the DUI case granted the motion. Based on this ruling, defendant moved to collaterally estop the State from contesting the motion to suppress in the controlled substances case. The trial court granted that motion. The State filed a certificate of impairment and timely appealed (see 188 Ill. 2d R. 604(a)(1)), contending that the trial court erred when it (1) granted the motion to suppress in the DUI case (appeal No. 2—03—1303) and (2) collaterally estopped the State from contesting the motion to suppress in the controlled substances case (appeal No. 2—04—0184). We disagree with the State's first contention and affirm the trial court's judgment in appeal No. 2—03—1303. However, we agree with the State's second contention and vacate the trial court's judgment in appeal No. 2—04—0184.

## I. FACTS

As an initial matter, we note that defendant's driving privileges were summarily suspended when he was arrested for DUI, and he petitioned to rescind that suspension (625 ILCS 5/2—118.1(b) (West 2002)). The evidence presented at the rescission hearing was stipulated to at the DUI suppression hearing and comprised the only evidence presented at that hearing. That evidence consisted of Officer Pate's testimony and a videotape revealing what transpired during three field sobriety tests that defendant failed.

At the rescission hearing, Officer Pate testified that he was on patrol in his marked squad car on August 17, 2002, when he saw defendant sitting in a car on a residential street in Hampshire at approximately 2:40 a.m. Defendant was smoking a cigarette in the driver's seat of his car, which was legally parked. Although many other cars were parked along that street, those cars were not occupied. As Officer Pate drove closer to defendant's car, he saw defendant reach toward the floorboard of the front passenger seat. Officer Pate was approximately 20 to 30 feet away from defendant's car when he made this observation, and he stated that he could not see specifically what defendant was doing. As Officer Pate continued to drive closer to defendant's car, defendant returned to a seated position but "slumped or slouched down a little bit ***, bending [his] knees and sitting down lower in the seat." Officer Pate then drove past defendant's car and parked his squad car in the middle of the street. At that time, Officer Pate lacked any information about defendant committing a crime or about any criminal activity in the area that night.

As Officer Pate, who was in uniform, approached defendant, he shined his flashlight on defendant's car and the area around it. Defendant's car was running, the driver's-side window was down, and

the radio was on. As Officer Pate neared defendant's car, he observed defendant turn the engine off. Officer Pate testified that he believed that defendant turned the engine off in order to turn down the radio, and he clarified that he never asked defendant to turn the engine off. When Officer Pate was standing by the rear quarter panel of the driver's side of defendant's car, he saw the neck of a brown glass bottle standing upright on the floorboard by the front passenger seat. Although Officer Pate could not see a label on the bottle and did not know what the bottle contained, he did notice that the bottle was uncapped.

While standing next to the driver's side of defendant's car, Officer Pate asked defendant for his identification, which defendant produced. The officer also asked defendant why he was sitting in his car on that street. Defendant said that he was waiting for his girlfriend to return to her home. Although defendant could not give Officer Pate his girlfriend's address, he did point to her house, which he was parked in front of. Officer Pate testified that he continued to question defendant about what he was doing on that street, because three homes were burglarized at the end of that street within the last week. Although Officer Pate knew that the burglaries were committed between 5 p.m. and 8 a.m., he did not have a description of the burglar or of the vehicle the burglar might have driven. In addition to homes, Officer Pate knew, some cars were burglarized in the area. During his conversation with defendant, Officer Pate noticed that defendant's eyes were bloodshot and glassy, he smelled of alcohol, and he slurred his speech. These observations led Officer Pate to request assistance from Officer Harris.

While waiting for Officer Harris to arrive, Officer Pate parked his squad car behind defendant's car and started the videotape recording system in his squad car. Officer Pate explained that he started videotaping his encounter with defendant because police department procedures require officers to record field sobriety tests, which Officer Pate planned to administer.

When Officer Harris arrived, he and Officer Pate approached defendant. Officer Harris, who approached on the passenger side, saw an open Miller Lite bottle on the floorboard near the front passenger seat, which is where Officer Pate saw the brown glass bottle. Officer Harris advised Officer Pate about his discovery, noting that the bottle was one-third full and cold. Defendant was asked to step out of his car, and Officer Pate administered three field sobriety tests. Although defendant did not stumble getting out of the car or walking to the rear of his car, he failed all three tests and was placed under arrest for DUI. During a subsequent search of defendant's vehicle, the officers

found a substance containing a methylenedioxy amphetamine derivative.

Based on this testimony and the videotape, the trial court granted defendant's petition to rescind the statutory summary suspension of his driving privileges. In reaching this conclusion, the trial court found that, when Officer Pate stopped defendant, the officer did not possess any evidence that defendant was involved in any type of criminal activity. Rather, the trial court noted that Officer Pate merely had a hunch that defendant had committed a crime.

Relying on this same reasoning, the trial court granted defendant's motion to suppress in the DUI case. The State timely moved to reconsider and for more detailed findings. In addressing the motion for more detailed findings, the trial court stressed that Officer Pate's basis to stop defendant was a "hunch [that] turned out to be something that all policemen hope that their hunches turn out to be, but it was nothing more than a hunch." The trial court then denied the motion to reconsider, noting that, although Officer Pate's testimony concerning the burglaries in the area was credible, such testimony was not sufficient to establish that the area was a "high crime area." The trial court emphasized that Officer Pate "essentially saw a young man sitting in a car smoking a cigarette," and "[t]his conduct [was] not sufficient to warrant the approach and questioning that took place." The State filed its notice of appeal and certificate of impairment in the DUI case on November 24, 2003.

Based on the DUI ruling, defendant moved to collaterally estop the State from contesting the motion to suppress in the controlled substances case. The trial judge in the controlled substances case, who was not the same judge who presided over the DUI case, granted the motion on January 28, 2004, finding that the parties were barred from relitigating the basis for defendant's stop and arrest because the parties and the issues were the same in both proceedings and a final judgment was entered in the DUI case. The State timely appealed, and we consolidated the appeals.

## II. ANALYSIS

### A. The Encounter Between Officer Pate and Defendant

Interaction between the citizenry and the police can be divided into nonconsensual and consensual encounters. See *People v. Murray*, 137 Ill. 2d 382, 387 (1990). The former consist of arrests and *Terry* stops. See *Murray*, 137 Ill. 2d at 387. The latter do not infringe upon any interest protected by the fourth amendment and therefore require no justification. *People v. Smith*, 331 Ill. App. 3d 1049, 1054 (2002). The State argues that the encounter between Officer Pate and

defendant was consensual, as Officer Pate was acting in his role pursuant to the community caretaker function of the police. Alternatively, the State argues that the stop was justified by reasonable suspicion, in accordance with the dictates of *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). We reject both contentions.

### 1. *Standard of Review*

■ Before addressing the State's arguments, we consider our standard of review. When reviewing a ruling on a motion to quash an arrest and suppress the evidence, our standard of review is usually twofold. We accord great deference to the trial court's factual findings and credibility determinations and reverse those conclusions only if they are against the manifest weight of the evidence. *People v. Gherna*, 203 Ill. 2d 165, 175 (2003); *People v. Sorenson*, 196 Ill. 2d 425, 431 (2001). A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident. *People v. Davis*, 352 Ill. App. 3d 576, 579 (2004). After reviewing the trial court's factual findings, we review *de novo* the trial court's ultimate legal ruling. *Sorenson*, 196 Ill. 2d at 431.

Here, the trial court made two factual findings that are relevant to the resolution of this appeal. First, the trial court found that the area around the residential street was not a high-crime area. Second, the trial court found that, when Officer Pate approached defendant, he observed only a young man sitting in a car smoking a cigarette. After reviewing the record, we conclude that neither of these findings is against the manifest weight of the evidence.

We also note that, though the trial court made no explicit finding on the matter, contradictory evidence existed in the record regarding one key fact. Defense counsel pointed out the following discrepancy at the hearing. Pate testified that he observed the neck of a brown bottle on the floor in front of the passenger seat as he approached defendant's vehicle. He was at the rear driver's-side quarter panel when he made this observation. The trial court also observed a videotape of events surrounding defendant's arrest, although the tape does not memorialize the initial part of the encounter between Pate and defendant. In the tape, a second officer removes the bottle from defendant's car. Prior to doing so, the second officer appears to move the passenger seat forward. Moreover, the officer was bent over facing toward the rear of the vehicle when he removed the bottle. Thus, it appears that the bottle was removed from the backseat area of the car, which contradicts Pate's testimony as to its location. This discrepancy raises a question of fact that goes directly to the question of when Pate acquired a reasonable and articulable suspicion sufficient to justify a

*Terry* stop. Typically, however, we construe the record in the light most favorable to the trial court's decision and any gaps in the record are resolved against the appellant. See *People v. Hurtado*, 208 Ill. App. 3d 110, 115 (1991); *People v. Majer*, 131 Ill. App. 3d 80, 83 (1985).

### 2. *Community Caretaking Function*

The State contends that Officer Pate was acting within a community caretaking or public safety function when he approached defendant and that consequently his encounter with defendant was consensual and not a seizure. Citing *People v. Smith*, 266 Ill. App. 3d 362 (1994), the State contends that the encounter was proper because nothing prevents officers from approaching and posing questions to an individual. The State misunderstands the nature of the community caretaker exception; this is understandable, however. As we noted in *People v. Mitchell*, 355 Ill. App. 3d 1030 (2005), numerous cases commit the same mistake.

■ Indeed, it is manifestly illogical to say that an encounter is consensual because of the role in which the police were acting. Consent, by definition, must come from the person who is the subject of the encounter. A person may object to any contact with the police, regardless of whether they are functioning in a community caretaking or crime control role. To call an encounter consensual because an officer is acting as a community caretaker would allow an officer to force a "consensual" encounter upon a person who desires no contact with the police under any circumstances. If the community caretaker exception is to justify a stop, it must be because the stop is reasonable. Allowing the doctrine to magically transform what is in fact a nonconsensual encounter into a consensual one would be to perpetuate a ridiculous legal fiction.

■ Moreover, if any encounter between an individual and a police officer that involves no coercion or show of authority is said to fall under the community caretaker exception, then the term serves no analytical function. Indeed, in Illinois case law, the doctrine has been treated synonymously with consensual encounters. See, *e.g.*, *People v. Harris*, 207 Ill. 2d 515, 522 (2003); *People v. Murray*, 137 Ill. 2d 382, 387-88 (1990); *People v. Laake*, 348 Ill. App. 3d 346, 349 (2004). Conversely, an earlier Illinois case recognized that an inventory search was reasonable under the community caretaker exception, not because it was not a search, but because one legitimate goal of the search was to ascertain the value of the property the police needed to secure on its owner's behalf. *People v. Ocon*, 221 Ill. App. 3d 311, 314-15 (1991). Although it concerned a search, *Ocon* properly recognized that action taken under the community caretaker exception is justified not

because it does not intrude upon an interest protected by the fourth amendment (U.S. Const., amend. IV), but, rather, because it intrudes upon such an interest in a way that is reasonable. After all, the fourth amendment forbids only unreasonable searches and seizures. *People v. Hall*, 352 Ill. App. 3d 537, 545 (2004).

As it has developed in other jurisdictions, the community caretaker doctrine has an analytical content distinct from arrests, *Terry* stops, and consensual encounters. A classic example of the type of stop to which the community caretaker exception applies appears in *State v. Chisholm*, 39 Wash. App. 864, 696 P.2d 41 (1985). In that case, a police officer observed a pickup truck being driven while a hat was resting on top of it. The officer, who was driving an unmarked vehicle, could not get the truck to stop. He radioed ahead to a marked unit, who stopped the defendant to inform him about the hat. Upon approaching the car, the second officer observed an open can of beer in plain view. The court observed that standards such as probable cause and reasonable suspicion have no place where a stop is made to assist the driver of a vehicle. *Chisholm*, 39 Wash. App. at 866, 696 P.2d at 43. Instead, the court held that the reasonableness of the stop must be judged by balancing the "individual's interest in proceeding about his business unfettered by police interference" and "the public's interest in having police officers perform services in addition to the traditional enforcement of penal and regulatory laws." *Chisholm*, 39 Wash. App. at 867, 696 P.2d at 43. Other jurisdictions have applied the community caretaker function in a similar fashion. See *Commonwealth v. Leonard*, 422 Mass. 504, 509-10, 663 N.E.2d 828, 832 (1996); *State v. Anderson*, 142 Wis. 2d 162, 417 N.W.2d 411 (1987); *Crauthers v. State*, 727 P.2d 9, 10-11 (Alaska App. 1986) ("We hold that Trooper Miller's action in engaging his emergency lights and contacting the defendant, following what he reasonably interpreted to be a request for assistance from the Crauthers vehicle, to be permissible under the 4th Amendment").

■ Thus, the community caretaker exception allows an actual seizure where the seizure is reasonable under certain circumstances. It has no place in a discussion regarding whether a seizure occurred in the first instance. Moreover, it is a doctrine that will rarely be invoked, typically having relevance only in the unusual circumstance where a police officer effectuates a seizure of an individual for the purpose of helping the individual and evidence of a crime is then found in plain view. Parenthetically, courts that have applied the doctrine in this manner have been willing to inquire into the subjective mental state of the police so that the doctrine does not become a vehicle for state overreaching. See, *e.g.*, *Anderson*, 142 Wis. 2d at 169, 417 N.W.2d at

414 (holding that the exception applies when a seizure occurs, the police were engaged in *"bona fide* community caretaker activity,"* and the public's interest in the police activity in question outweighs the intrusion on the individual's right to be let alone). In short, the community caretaker exception is a distinct doctrine having nothing to do with consensual encounters, and its invocation in this case is both improper and unnecessary.

### 3. *The Seizure*

■ The State's second contention is that the encounter was justified because it was based on reasonable and articulable suspicion of criminal activity. Reasonableness pursuant to the fourth amendment generally requires a warrant supported by probable cause. *People v. Love*, 199 Ill. 2d 269, 275 (2002). However, there are exceptions to the warrant requirement, one of which is a stop pursuant to *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). *People v. Brown*, 343 Ill. App. 3d 617, 622 (2003).

Determining whether a stop was constitutional involves a two-step process. *People v. Croft*, 346 Ill. App. 3d 669, 675 (2004). First, we decide whether the stop was justified at its inception, and if it was, we then determine whether the scope of the stop was proportional to the circumstances that justified the stop in the first place. *Croft*, 346 Ill. App. 3d at 675. Here, we are concerned with whether the stop was justified at its inception.

A court objectively considers whether a stop was proper. *Croft*, 346 Ill. App. 3d at 675. We look at the facts available to the officer and ask whether the officer's action was appropriate. *Croft*, 346 Ill. App. 3d at 675. An investigatory stop is proper if the officer can point to specific, articulable facts that, when combined with the rational inferences derived from those facts, provide reasonable suspicion that the person seized has committed or is about to commit a crime. *Village of Mundelein v. Thompson*, 341 Ill. App. 3d 842, 848 (2003). The facts supporting reasonable suspicion do not need to constitute probable cause (*Brown*, 343 Ill. App. 3d at 622) and can arise even when no violation of the law was witnessed (*People v. Scott*, 249 Ill. App. 3d 597, 601 (1993)). However, a mere hunch is insufficient to justify a *Terry* stop. *Brown*, 343 Ill. App. 3d at 622.

We must first determine at what point defendant was seized so that we may determine what facts were available to the officer at the time of the seizure. We believe that the seizure occurred prior to the time Officer Pate allegedly observed the brown bottle on the floor of defendant's car. In determining whether a seizure has occurred, a court must look to the totality of the circumstances. *United States v.*

*Mendenhall*, 446 U.S. 544, 554, 64 L. Ed. 2d 497, 509, 100 S. Ct. 1870, 1877 (1980); *People v. Ortiz*, 317 Ill. App. 3d 212, 220 (2000); A seizure occurs when a reasonable person would not feel free to leave under the circumstances. *Mendenhall*, 446 U.S. at 554, 64 L. Ed. 2d at 509, 100 S. Ct. at 1877. By advocating an analysis based on the totality of the circumstances, the Supreme Court eschewed reliance on rigid, technical, black-letter rules in favor of a practical, realistic inquiry. See *Illinois v. Gates*, 462 U.S. 213, 230-40, 76 L. Ed. 2d 527, 543-49, 103 S. Ct. 2317, 2328-32 (1983). In this sense, then, every case like this one is *sui generis* in that no two factual situations are identical. Precedent may provide some insight; however, common sense must be our main guide in assessing the totality of the circumstances and determining whether a reasonable person in defendant's position would feel free to leave.

Under the circumstances presented here, a reasonable person would not feel free to simply drive away as Officer Pate approached. The encounter between defendant and Officer Pate began when Officer Pate drove past defendant and stopped his squad car in the middle of the road. Stopping the car in the middle of the road would have conveyed two things to a reasonable person in defendant's position. First, it communicated a sense of urgency on Officer Pate's part. Second, private citizens cannot, and simply do not, stop their cars in the middle of the road and block traffic under normal circumstances. See 625 ILCS 5/11—1304 (West 2002). Officer Pate's actions were consistent with those of a police officer initiating formal contact with a suspect, not those of a citizen simply stopping to have a conversation with defendant. By stopping in the middle of the roadway, Officer Pate was essentially demonstrating his authority as a police officer. Additionally, as he approached defendant's car, Officer Pate shined a flashlight around and into it. Again, private citizens do not behave in this manner. Likely, any one of us would feel threatened, or at least imposed upon, if a stranger approached in this manner. Also, Officer Pate approached the car from the rear driver's-side quarter panel, rather than simply walking up to the window as an ordinary citizen typically would. The message that Officer Pate's actions conveyed to defendant was clear—"I am interested in you and I will speak to you right now." No ordinary citizen, the majority of whom constitute the hypothetical reasonable person, would feel free to simply start his or her car and drive away. Pretending otherwise completely disregards both common sense and the Supreme Court's admonition in *Mendenhall* that a person is seized when, *"in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."* (Emphasis added.) *Mendenhall*, 446 U.S. at 554, 64 L. Ed. 2d at 509, 100 S. Ct. at 1877.

In *Mendenhall*, the Court observed that the tone of an officer's voice might convey to a reasonable person that he or she is not free to leave. *Mendenhall*, 446 U.S. at 554, 64 L. Ed. 2d at 509, 100 S. Ct. at 1877. That Officer Pate shined a flashlight into defendant's car is analogous. It is intrusive, and, just as may be conveyed by certain tones of voice, it suggests confrontation. Ordinary people do not go about shining lights at each other or around or into their personal effects and private spaces. Conversely, simply pulling up alongside a person sitting in a car and asking a question would communicate nothing more than a casual encounter on the street. Officer Pate's actions, however, given the urgency implicit in his stopping in the middle of the street and the confrontational nature of shining a light into defendant's car, were certainly more like a traffic stop initiated by turning on the squad's overhead lights or siren than they were a casual, consensual encounter. We do not mean to imply that a police officer may never approach an individual seated in a car. This case presents an extremely close question, and we believe that, based on the evidence presented in this case, a reasonable person would not have felt free to leave, given the totality of the circumstances, prior to the point when Officer Pate allegedly observed the brown bottle.

The dissent disagrees with this conclusion. We find it most notable that nowhere does the dissenting justice state that a reasonable person in defendant's position would have felt free to leave under the circumstances. That determination is the only issue relevant to whether a seizure occurred. *People v. Robinson*, 167 Ill. 2d 397, 406 (1995). How a person who is confronted by an officer who stops suddenly in the middle of a street, blocking traffic, illuminates the area including the interior of the vehicle in which the person sits, and approaches in a manner designed to maximize the officer's position in case of a confrontation would feel free to simply drive away was not clear to the trial judge and remains unclear to us. The first factor we rely on—stopping in the middle of the street and blocking the roadway—is a show of official authority. The second—illuminating the interior of the vehicle—conveys a sense of intrusiveness and confrontation. Our observation that ordinary citizens do not behave in such a manner simply recognizes the reality that what was being communicated to defendant under the present circumstances was far different from the "wholly friendly exchanges of pleasantries" referred to in *Terry*. *Terry*, 392 U.S. at 13, 20 L. Ed. 2d at 901, 88 S. Ct. at 1875. While the dissent professes that "[t]he majority's geometrical analysis of this encounter is lost on me" (357 Ill. App. 3d at 432), it explains the relevance of these factors a short time later. The dissent characterizes Officer Pate's actions as "employing such safety

measures as approaching the subject vehicle from the rear." 357 Ill. App. 3d at 433. In other words, Officer Pate was treating defendant as a suspect and, in fact, a dangerous suspect. It strains credulity to suggest that the employment of such measures communicated nothing to defendant.

This brings us to a related point raised by the dissent, officer safety. This is certainly a legitimate concern. It does not, however, immunize from constitutional scrutiny all actions taken in its name. Most likely, the safest manner for an officer to approach an unknown individual would be with his or her gun drawn and trained upon that individual. We know, however, from *Mendenhall*, 446 U.S. at 554, 64 L. Ed. 2d at 509, 100 S. Ct. at 1877, that a display of a weapon is highly indicative of a seizure despite any contribution it might make to officer safety. The fourth amendment protects citizens, not the State. If, in the name of officer safety, an officer chooses to take certain actions that amount to a seizure, that may be understandable under certain circumstances. However, if those actions are taken absent some justification for a seizure, the State is not entitled to utilize their fruits in a criminal prosecution. The essential fact of this case is that an individual was sitting in his lawfully parked vehicle. All else follows from this innocent activity. There is no indication that some reasonable, articulable suspicion existed that defendant was in some way dangerous.

The dissent's use of *Mendenhall* ignores the Supreme Court's clear directive that whether a seizure occurred is to be judged in light of the totality of the circumstances. Undoubtedly, *Mendenhall* does set forth a list of factors that may be relevant to determining whether a seizure has occurred. *Mendenhall*, 446 U.S. at 554, 64 L. Ed. 2d at 509, 100 S. Ct. at 1877. However, as both the United States and Illinois Supreme Courts make clear, these are but examples of things that are indicative of a seizure. *Mendenhall*, 446 U.S. at 554, 64 L. Ed. 2d at 509, 100 S. Ct. at 1877; *Murray*, 137 Ill. 2d at 390-91. While the presence of such factors may be highly indicative of the occurrence of a seizure, their absence says virtually nothing. Instead, courts must evaluate the facts before them in a practical and realistic manner, as the Supreme Court has mandated by directing courts to make these determinations in light of the totality of all of the circumstances surrounding the encounter. *Mendenhall*, 446 U.S. at 554, 64 L. Ed. 2d at 509, 100 S. Ct. at 1877 ("We conclude that a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave").

The dissent improperly focuses upon policy considerations when it

criticizes our employment of a practical, realistic inquiry, rather than black-letter rules, in evaluating the facts of this case. See 357 Ill. App. 3d at 432. The dissent further asserts that our analysis is neither practical nor realistic and that it "may well have truly lethal effects." 357 Ill. App. 3d at 432. Our reference to the practical and realistic relates to the Supreme Court's direction to consider cases such as these in light of the totality of the circumstances. The facts are to be analyzed in a practical and realistic manner. The Supreme Court was not suggesting that courts engage in any type of rulemaking that they consider prudent. The dissent, on the other hand, focuses on what it considers practical and realistic to reshape the balance between state interests and individual interests established by the fourth amendment. Such policy decisions were made by the founders long ago, when they crafted the fourth amendment, and the Supreme Court, when it applied that amendment in cases like *Mendenhall*.

Next, we must determine whether the facts available to Officer Pate at the time of the seizure justified it. The State argues that the officer had reasonable and articulable suspicion that defendant was involved in a crime because (1) the street on which defendant was parked was the target of some burglaries; (2) defendant was seated in his parked car at 2:40 a.m.; (3) the officer observed furtive movements; and (4) defendant slouched down in his seat as the officer drove past him. We cannot conclude that these facts amounted to reasonable and articulable suspicion of criminal activity.

First, the fact that defendant was seen in a neighborhood where some homes and vehicles were burglarized did not create a reasonable belief that defendant was involved in a crime. See *Croft*, 346 Ill. App. 3d at 675-76. Although Officer Pate was aware of the burglaries, he did not have a description of the burglar or the vehicle the offender *may* have used. Also damaging to the State's position is the fact that the neighborhood was not a "high crime area," which, even in itself, does not justify stopping an individual. See *People v. Parra*, 352 Ill. App. 3d 584, 588 (2004).

Second, the time of day did not give Officer Pate a basis to stop defendant. Despite the early hour, Officer Pate only observed defendant smoking a cigarette in his legally parked car. Although no one else was sitting in a car on the street at 2:40 a.m. on that Saturday, there were numerous other vehicles parked along that street. When Officer Pate saw defendant, he did not know whether defendant was a resident of one of the homes located on that street, whether he was parked in front of the house waiting for a friend to exit, or whether he was waiting for a friend to return home, which defendant claimed he was doing. Given these facts, Officer Pate had no reason to suspect defendant of criminal activity.

Third, we find that defendant's act of reaching toward the floorboard by the passenger seat did not give Officer Pate a basis to stop defendant. In *People v. Mills*, 115 Ill. App. 3d 809, 810-11 (1983), the arresting officer saw the defendant, who was parked in a municipal parking lot, quickly move toward the floorboard of his car. This court found this furtive movement insufficient to create a reasonable belief that criminal activity was afoot because such behavior could be nothing more than an innocent act. *Mills*, 115 Ill. App. 3d at 814-15. We see no basis to depart from the reasoning in *Mills*.

Fourth, the fact that defendant slouched down in his seat as Officer Pate drove past him added nothing to create a reasonable and articulable suspicion of criminal activity. In *People v. Gottenborg*, 41 Ill. App. 3d 8, 10 (1976), the officer saw the defendant "slinking down" in the driver's seat of his car. The appellate court determined that the defendant's act did not give the officer a basis to search the defendant's vehicle following his arrest because such behavior "could just as easily be consistent with innocent actions, when the conduct of young men during a warm summer evening is considered." *Gottenborg*, 41 Ill. App. 3d at 10. Although, as we noted in *Mills*, probable cause to arrest is different from reasonable and articulable suspicion to stop, the "slinking down" still could have been an innocent act that did not justify a stop. *Mills*, 115 Ill. App. 3d at 815.

Lastly, even when we consider all of these facts collectively, we cannot conclude that Officer Pate possessed a reasonable and articulable suspicion that defendant was involved in a crime. See *Davis*, 352 Ill. App. 3d at 582. In order to justify a stop, the situation the officer faces must be so far from the ordinary that any competent officer in a similar position would act with haste. *Croft*, 346 Ill. App. 3d at 675. The facts available to Officer Pate fall short of this standard. Thus, we hold that Officer Pate did not have a reasonable and articulable suspicion that defendant was involved in criminal activity. Because we determine that Officer Pate lacked a proper basis to stop defendant, we need not consider whether the officer exceeded the scope of a proper *Terry* stop. *Croft*, 346 Ill. App. 3d at 676.

## B. Collateral Estoppel

■ As a final matter, we consider whether the trial court erred when it collaterally estopped the State from contesting the motion to suppress in the controlled substances case. Before addressing this issue, we note that we have jurisdiction to consider it because the *substantive effect* of the order applying collateral estoppel was to suppress evidence in the controlled substances case. See 188 Ill. 2d R. 604(a)(1).

■ We now address the merits. Collateral estoppel bars the trial of an issue that has been fairly and completely resolved in a prior proceeding. *People v. Tenner*, 206 Ill. 2d 381, 396 (2002). The doctrine applies when: (1) the issue decided in the first case was identical to the issue presented in the second case; (2) a final judgment on the merits was rendered in the first case; and (3) the party sought to be estopped was a party to the first case or in privity with a party to the first case. *People v. One 1984 Pontiac Parisienne Sedan*, 323 Ill. App. 3d 717, 722 (2001). A judgment is final for purposes of applying collateral estoppel when the potential for appeal is exhausted. *People v. Powell*, 349 Ill. App. 3d 906, 909 (2004). We review *de novo* the application of collateral estoppel. *Powell*, 349 Ill. App. 3d at 909.

■ Here, when the trial court collaterally estopped the State from contesting the suppression motion in the controlled substances case, the DUI suppression order was on appeal to this court and, thus, was not final. Because the DUI suppression order was not final, the trial court erred when it ruled that the judgment effected a collateral estoppel in the controlled substances case. Accordingly, we must vacate that order.

With that said, we would be remiss if we did not comment on the sequence of events in this case. Specifically, on August 26, 2002, defendant moved to quash his arrest and suppress the evidence seized in the DUI case. Three months later, on November 19, 2002, defendant was indicted for unlawful possession of a controlled substance. On November 20, 2002, the trial court granted defendant's petition to rescind the statutory summary suspension of his driving privileges, the testimony on which served as the evidence in the DUI suppression hearing.

What is troublesome to this court is that on July 30, 2003, eight months after defendant was indicted for unlawful possession of a controlled substance, the hearing on the motion to suppress in the DUI case was held, and the trial court granted that motion one month later on August 26, 2003. At no point prior to August 26, 2003, did defendant move to join the DUI and controlled substances cases, even though the basis to quash the arrest and suppress the evidence seized was the same in both cases. The underlying result of such action was that defendant could test the viability of his motion to suppress in the DUI case, and, if unsuccessful, he could present more evidence at the controlled substances suppression hearing in the hopes of obtaining a favorable judgment. The DUI suppression hearing thus served as a dress rehearsal for the controlled substances suppression hearing. We do not determine that such a procedure is improper, but we do determine that it was not an economical use of resources. In the

future, the parties, and the court if apprised, should seek to avoid duplication of matters that could be resolved simultaneously.

## III. CONCLUSION

In conclusion, we hold that Officer Pate effected an invalid *Terry* stop, as he seized defendant without a reasonable and articulable suspicion that defendant was involved in a crime. Thus, the trial court properly granted the motion to suppress in the DUI case. However, we also hold that the trial court erred when it barred the State from contesting the motion to suppress in the controlled substances case based on the decision rendered in the DUI case, because the DUI suppression order was not final.

For these reasons, the judgment of the circuit court of Kane County in appeal No. 2—03—1303 is affirmed. In appeal No. 2—04—0184, the judgment of the circuit court of Kane County is vacated.

No. 2—03—1303, Affirmed.
No. 2—04—0184, Vacated.

McLAREN, J., concurs.

PRESIDING JUSTICE O'MALLEY, dissenting:

I agree with the majority's analysis of whether and when a seizure may be justified as an exercise of the community caretaking function of police.

I dissent, however, from the majority's conclusion that defendant was seized as Officer Pate approached defendant's vehicle on foot, that is, before Officer Pate saw the brown bottle on the floor of defendant's car, and, of course, before Officer Pate spoke with defendant and noticed signs of intoxication. The timing of the seizure is crucial, for if, as I believe, the seizure occurred after Officer Pate made these observations, then he would have had more than sufficient warrant for his action (a point that the majority does not and could not dispute).

I must dissent because the majority's conclusion that defendant was seized as Officer Pate approached the car on foot is flatly at odds with clearly controlling precedent from both the United States and Illinois Supreme Courts, and because the majority's analysis, *viz.* whether the officer's actions were of the kind that an ordinary citizen would take, is both odd and unprecedented in our storied fourth amendment jurisprudence. Consequently, this decision and the way in which it was arrived at constitute a major upheaval of established search and seizure law. I do not use the word "upheaval" lightly. If the

question of whether a seizure has occurred turns on whether the police officer's actions were of a kind that an ordinary citizen would take, then the consequences are enormous. Ordinary citizens routinely request the police to check something or someone out precisely because the citizen is scared to do it, *i.e.*, he thinks it's the kind of action that police, not ordinary citizens, should take. Frequently, these requests do not contain information sufficient to form a reasonable and articulable suspicion of criminal activity. In the wake of today's decision, police can respond to these citizen requests with the suggestion that the citizen himself check out the situation. When the citizen responds that he thinks it's the kind of situation that police, not ordinary citizens, should check out, is the officer to respond that that is precisely why he is not going to take any action?

A seizure occurs " '[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen.' " *People v. Murray*, 137 Ill. 2d 382, 387-88 (1990), quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16, 20 L. Ed. 2d 889, 905 n.16, 88 S. Ct. 1868, 1879 n.16 (1968). The majority scrutinizes Officer Pate's actions to determine whether they were of the kind that ordinary citizens, not police officers, would take. See 357 Ill. App. 3d at 421. Finding that ordinary citizens neither park in the middle of the street nor shine flashlights into or around people's cars nor approach those cars on foot from the rear, the majority concludes that these actions were a show of authority that restrained defendant's liberty. I must credit the majority with a hearty, creative spirit. I have not seen the like of this approach in any case interpreting the fourth amendment. I take it that the lack of authority cited in support of the majority's perspective is a silent admission of novelty. Even in its response to my points, the majority still does not cite any authority for, and in fact ignores my criticism of, its notion that a seizure is determined by looking at whether the officer is acting as an officer as opposed to a private citizen. Indeed, the majority appears to have a distinctly cavalier view of precedent, writing that every case is *sui generis*, that precedent provides only "some insight" into current issues, and that a "practical, realistic inquiry" is superior to "reliance on rigid, technical, blackletter rules." 357 Ill. App. 3d at 421. I admit that any particular set of facts seldom survives wholesale into the next case, a reality that permits courts to justify different results in cases that at first blush appear to be factually similar. However, our body of case law keeps its coherence in the flux of facts only by adhering to principles. Today the majority reaches its result by substituting principles of its own devising for those that the law has recognized. Lacking a grounding in the law—a principled backdrop—the majority's analysis quickly loses its way and takes on the appearance of an *ad hoc* enterprise.

First, for all the majority's avowed distaste for black-letter rules, any reader will find it difficult not to draw such a rule from the majority's analysis, for it is continually suggested throughout the analysis that police must act as little like police as possible, lest a seizure occur. However, under established search and seizure law, the touchstone is not whether the police officer is acting peculiarly as a police officer in initiating an encounter. *Terry* recognized that "not all personal intercourse between policemen and citizens involves 'seizures' of persons." *Terry*, 392 U.S. at 19 n.16, 20 L. Ed. 2d at 905 n.16, 88 S. Ct. at 1879 n.16. Elaborating further on the variety of police-citizen encounters, *Terry* said:

> "Street encounters between citizens and police officers are incredibly rich in diversity. They range from wholly friendly exchanges of pleasantries or mutually useful information to hostile confrontations of armed men involving arrests, or injuries, or loss of life. Moreover, hostile confrontations are not all of a piece. Some of them begin in a friendly enough manner, only to take a different turn upon the injection of some unexpected element into the conversation." *Terry*, 392 U.S. at 13, 20 L. Ed. 2d at 901, 88 S. Ct. at 1875-76.

*Terry* did not then go on to hold that any instance of police-citizen interaction must be indistinguishable from citizen-citizen interaction in order to fall short of a seizure. Encompassed within the breadth of the nonseizure encounters generally described by *Terry* and its countless progeny is a wide gamut of activity unique to police, far unlike citizen-citizen encounters. Ordinary citizens mind their own business much more often than police do. An ordinary citizen does not normally approach a stranger and ask him for identification or ask him what business he has in that location or ask him to reveal what is on his person, yet these are actions that Illinois courts have held do not effect a seizure when undertaken by police. See, *e.g.*, *People v. Tilden*, 70 Ill. App. 3d 859, 863 (1979) (officer did not seize defendant by asking him to approach and produce identification); *People v. Kennedy*, 66 Ill. App. 3d 267, 270, 274 (1978) (officer did not seize defendant by approaching him as he walked along a highway at 1 a.m., asking if he was lost, and asking what was in the bag he was carrying); *People v. Jordan*, 43 Ill. App. 3d 660, 661 (1976) (defendant, who was running down a street at night, was not seized when officer asked him why he was running). "[W]here a police officer merely engages in conversation with an individual, and no restraint has been made upon the individual's freedom to walk away from the officer, such an encounter does not constitute a stop *even though the encounter was investigative in nature.*" (Emphasis added.) *Kennedy*, 66 Ill. App. 3d at 273. If, as is

the case, ordinary citizens do not normally act in an investigative manner, then does the majority think that this statement of the law is not valid after today's decision and that all investigative encounters between police and citizens are seizures?

The majority appears to believe that this encounter was a seizure because "what was being communicated to defendant *** was far different from the 'wholly friendly exchanges of pleasantries,' referred to in *Terry*." 357 Ill. App. 3d at 422, quoting *Terry*, 392 U.S. at 13, 20 L. Ed. 2d at 901, 88 S. Ct. at 1875. If the majority has read *Terry* as holding that a police-citizen encounter is either a "wholly friendly exchange of pleasantries" or a seizure, then the majority has not only fundamentally misunderstood *Terry* (the criterion in that case obviously is not the pleasantness of the encounter) but also lost sight of its own requirement that police-citizen encounters be like citizen-citizen encounters, for not even the latter are always "wholly friendly exchanges of pleasantries."

In the decades since *Terry*, courts have labored hard to determine what transforms a police-citizen encounter into a seizure. If all the while the criterion was simply whether the officer acted as an officer during the encounter, then considerable ink was wasted. One may admire the majority's zeal for simplicity while at the same time seeing its approach as absolutely alien to the law. " 'The mere knowledge by the person questioned that the person asking the questions is a police officer cannot in itself constitute a factor of threatened force because, were that so, every question put to a person under any circumstances by a self-identified police officer on duty would by that very fact constitute a *Terry* stop.' " *People v. Tilden*, 70 Ill. App. 3d 859, 862 (1979), quoting *People v. Jordan*, 43 Ill. App. 3d 660, 662-63 (1976). Whether a police officer identifies himself as such by his words or through his actions, the mere fact that the citizen knows that identity does not give rise to a seizure.

The majority of course emphasizes that its holding is not that "a police officer may never approach an individual seated in a car" (357 Ill. App. 3d at 422), yet elsewhere the reader is informed that the officer must approach the individual as would "a citizen simply stopping to have a conversation with" him (357 Ill. App. 3d at 421). That is, police must strip themselves of their official trappings. The majority cites no precedent for such a view precisely because such a view is absolutely unprecedented. If the majority's approach were in fact the law, then what are the marks of proper citizen-like behavior, sanitized of police-like traits? The majority gives us some guidelines. First, an officer acting like a proper citizen would not park in the middle of the street, which not only is illegal for a private citizen to do but com-

municates "a sense of urgency." 357 Ill. App. 3d at 421. Rather, an officer acting like a proper citizen would "simply [pull] up alongside" the individual's car, thereby suggesting "nothing more than a *casual* encounter on the street." (Emphasis added.) 357 Ill. App. 3d at 422. Here, the majority is seriously misguided. Police cannot afford to be casual in the performance of their duties. As *Terry* noted, police-citizen encounters may "begin in a friendly enough manner, only to take a different turn upon the injection of some unexpected element into the conversation." *Terry*, 392 U.S. at 13, 20 L. Ed. 2d at 901, 88 S. Ct. at 1875-76. "American criminals have a long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded." *Terry*, 392 U.S. at 23, 20 L. Ed. 2d at 907, 88 S. Ct. at 1881. "Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties." *Terry*, 392 U.S. at 23, 20 L. Ed. 2d at 907, 88 S. Ct. at 1881. As I explain more fully below, the effect of the majority's plea for casualness in police-citizen encounters is to force a wholly inappropriate choice on police who wish to obey the constitution: act in a disarming way, that is, dispense with precautions that are, in my view, "practical" and "realistic" (see 357 Ill. App. 3d at 421), or act not at all and leave the citizenry unprotected. I doubt the framers intended to dampen police initiative with such a Hobson's choice.

Continuing with its unique analysis, the majority also informs us that, when approaching another's car on foot, an officer acting like a proper citizen would not approach the driver's window of the car from the area of the rear driver's side but rather would "simply walk[ ] up to the window as an ordinary citizen typically would." 357 Ill. App. 3d at 421. Third, an officer acting like a proper citizen would not shine a flashlight into and around a person's car. 357 Ill. App. 3d at 422.

I cannot see how Officer Pate would have reduced the tension in the encounter by following the first two of these guidelines. As for the first, where does the law permit a citizen to double-park his car alongside another parked car to speak to its occupants? And it seems to me that Officer Pate would have communicated an even greater sense of urgency by blocking defendant's car in its parking space than by parking in the middle of the street. Had Officer Pate simply double-parked beside defendant, a reasonable person in defendant's position would have drawn the inference that Officer Pate wanted to engage defendant immediately, without having the time to park and approach on foot. As for the second of these guidelines, I confess an absolute inability to understand how Officer Pate created an impression of urgency by approaching defendant's driver's window from the rear.

The majority's geometrical analysis of this encounter is lost on me.[1] The simple fact is that the trajectory of a private citizen's approach to a car is determined entirely from where he begins his approach. Depending on the circumstances, that citizen may well find himself approaching from the rear of the car. Has he then crossed the line into the unique province of police?

Finally, the majority counsels that a proper citizen would not shine a flashlight in and around a vehicle. This hardly matters, for Illinois courts have held that a police officer's shining a flashlight into a car is not coercive. See *People v. Holdman*, 73 Ill. 2d 213, 220 (1978) (shining flashlight into moving car suspected to be connected with fugitive did not amount to coercion; the officers "were simply performing their official duty"); *People v. Erby*, 213 Ill. App. 3d 657, 662 (1991) (shining light into suspicious car parked near gas station was not a seizure; court held: "[S]hining a light into a vehicle, especially a parked vehicle as is the case here, does not constitute a stop absent coercion or a threat of coercion by police officers"); *cf. People v. Bunch*, 207 Ill. 2d 7, 19 (2003) (show of authority in officer's standing "just a foot from defendant and shining his flashlight in defendant's face," asking " 'What's your name? Where you [*sic*] coming from?' ").

The majority asserts that a "practical, realistic inquiry" is superior to the rigidity of black-letter rules (357 Ill. App. 3d at 421), yet its approach here is neither practical nor realistic and may well have truly lethal effects. Fourth amendment jurisprudence has long justified the exclusionary rule on the supposition that the prospect of illegally seized evidence becoming a legal nullity in court will deter police from effecting illegal seizures. See *People v. Tisler*, 103 Ill. 2d 226, 247 (1984); *People v. Dowery*, 62 Ill. 2d 200, 203-04 (1975). Suppose, after the issuance of this opinion, a citizen in our judicial district calls the Village of Hampshire police department at 2:30 a.m. and reports that an unfamiliar man in an unfamiliar vehicle is parked along the curb outside the citizen's house. The citizen requests that the police investigate the matter. Due to today's opinion, when the dispatched police officer arrives on the citizen's street, he knows that he risks violating the fourth amendment if he investigates the report while

---

[1]The majority is correct that, later in this dissent, I note that Officer Pate's angle of approach was a precautionary measure. But the fact that it is safer for an officer to approach from the rear does not mean that such an approach is more of a show of authority than approaching from a different angle that provides the citizen with a prolonged opportunity to observe the officer approach on foot. Moreover, the fact that one approach is safer does not mean that the other is the angle a private citizen would always take.

employing such safety measures as approaching the subject vehicle from the rear and shining a flashlight into the darkness within and around the vehicle. If the majority accepts the deterrence rationale for the exclusionary rule (as it must under current law), then it cannot issue today's ruling without expecting the officer in my hypothetical situation to avoid using these safety measures. He might do so by conducting his investigation without these measures or he might (absurdly, it seems to me) delay his investigation until daylight so as to at least dispense with the need for the offending flashlight. Thus, the deterrent effect of today's opinion may be fulfilled either in the officer's disregard for personal safety or in his reckless postponement of his duty. Neither course, obviously, will serve the citizen who phoned in the report. I fear that what really will be deterred as a result of today's decision is active police work at night. It is neither "realistic" nor "practical" to trammel peace officers in this way.

So caught up in what it considers the unique factual circumstances in this case (even though, as I explained above, factual uniqueness itself proves nothing), the majority fails to consider the concrete guidance that our appellate court has been given in reviewing a trial court's disposition of a motion to suppress. In *People v. Murray*, 137 Ill. 2d 382, 390 (1990), the supreme court listed several circumstances that may be indicative of a seizure: "(1) the threatening presence of several officers, (2) the display of a weapon by an officer, (3) some physical touching of the person of the citizen, and (4) the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Murray* drew these factors from *United States v. Mendenhall*, 446 U.S. 544, 64 L. Ed. 2d 497, 100 S. Ct. 1870 (1980), and took them quite seriously. Finding that none of the factors were present in the facts before it, *Murray* concluded that no seizure had occurred. The majority apparently has a less complimentary view of the *Mendenhall* factors, for it acknowledges them only in remarking that, in *Mendenhall*, "the Court observed that the tone of an officer's voice might convey to a reasonable person that he or she is not free to leave." 357 Ill. App. 3d at 422. The majority then draws a forced comparison between the use of a flashlight and a peremptory tone of voice. This is not how precedent is to be acknowledged. In their wisdom, both the United States Supreme Court and our supreme court have not abandoned us to the situational decision-making that the majority oddly feels is its lot. The guidance is there if the majority would have it. None of the *Mendenhall* factors are present here, and that is quite obvious.

In addition to the *Mendenhall* factors, there are specific principles applicable here. First, "an individual is not seized for fourth amend-

ment purposes when police ask questions of that individual, including a request for identification, so long as the officers do not convey by their words or actions to the person being questioned that compliance with their requests is required." *People v. Gherna*, 203 Ill. 2d 165, 179 (2003). Second, and more specifically, "the mere approaching and questioning of a person seated in a parked vehicle does not constitute a seizure." *Murray*, 137 Ill. 2d at 391. This case bears no relevant factual differences from *Murray*, where the officers approached the defendant as he was sleeping in his car, which was legally parked on a frontage road. The officers approached the car, knocked on the window, woke the defendant, and then asked him to step out of the car and produce identification—actions, I hasten to add, that ordinary citizens would not take. As the defendant complied with these requests, the officers saw a handgun on the floor of the car and arrested the defendant. Finding none of the *Mendenhall* factors present, the supreme court held that the defendant was not seized until after the officers saw the handgun. *Murray*, 137 Ill. 2d at 390-93.

Officer Pate's initial encounter with defendant was no more coercive than the encounter in *Murray*. Officer Pate approached defendant, requested identification, and questioned him about his presence on the street. If at any time during this conversation defendant believed he was not free to leave, he had no more reason for this belief than did the defendant in *Murray*, who was awakened out of a sleep by police officers rapping on his window and requesting him not just to produce identification but to step out of the car as well. Of course, here the majority holds that a seizure occurred even before Officer Pate uttered a word to defendant.

The majority finds it "most notable" that I have not said whether a reasonable person in defendant's position would have felt free to leave under the circumstances. 357 Ill. App. 3d at 422. However, because precedent casts such a controlling shadow here, my personal views (and the majority's), unfettered by precedent, are irrelevant. Does the majority think that a reasonable person in the defendant's position in *Murray* would feel free to leave? Obviously not, but an appellate court is bound to follow supreme court precedent no matter if it disagrees with that precedent.

This is not the first time that a decision of this district has read the fourth amendment far too restrictively as respects what constitutes coercion in a police-citizen encounter. See *People v. Gonzalez*, 324 Ill. App. 3d 15 (2001) (request for identification from passenger in car stopped for traffic violation was in itself coercive such that a reasonable person would not feel free to decline), *rev'd*, 204 Ill. 2d 220, 236 (2003) (rejecting "appellate court's conclusion that the trial court

implicitly and properly determined that defendant did not feel free to decline [the request for identification]," because such a request is "facially innocuous" and does not "increase the confrontational nature of the encounter"). If this case is heard by our supreme court, I feel reversal is once again inevitable.