THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOHN L. SLOUP, Defendant-Appellant.

Second District    No. 2—03—0992

Opinion filed September 2, 2005.

O'MALLEY, P.J., dissenting.

G. Joseph Weller and Patrick M. Carmody, both of State Appellate Defender's Office, of Elgin, for appellant.

Joseph E. Birkett, State's Attorney, of Wheaton (Martin P. Moltz, of State's Attorneys Appellate Prosecutor's Office, of counsel), and Peter N. Stein, of Highland Park, for the People.

JUSTICE BYRNE delivered the opinion of the court:

Defendant, John L. Sloup, was convicted of unlawful possession of a controlled substance (720 ILCS 570/402(c) (West 2002)). He appeals, arguing that the trial court erred in denying his motion to quash the arrest and suppress the drug paraphernalia seized from his vehicle after an early-morning traffic stop. We reverse.

## FACTS

Officer Opelt of the Westmont police department was the only witness to testify at the hearing on the motion to quash the arrest and suppress the evidence. On direct examination by defense counsel, Officer Opelt testified that, while on patrol at 3 a.m. on September 28, 2003, he spotted a Buick driven by defendant traveling in the left eastbound lane of 63rd Street near Cass Avenue. Officer Opelt observed the Buick weave in its lane a couple of times. The car touched but did not cross the yellow line. Officer Opelt saw the Buick pull within five or six feet of the rear bumper of another car that was traveling slowly in the same lane. The Buick passed the car on the right but did not signal a lane change until its tires had touched the white lines that divided the left and right eastbound lanes.

Officer Opelt stopped the Buick and ran a check on the license plate but found nothing of note. Officer Opelt exited his car and approached the Buick. Defendant, who was the only occupant, lowered his window. Officer Opelt did not detect an odor of alcohol or cannabis or see anything in plain view that would indicate criminal activity. He asked defendant to produce his driver's license and proof of insurance, and defendant complied. Officer Opelt returned to his squad car, where he ran a check on defendant's license, again finding nothing amiss. Officer Opelt returned to defendant's car but did not return defendant's license to him.

Officer Opelt testified that, because he believed that defendant was acting unusually nervous for a routine traffic stop, he inquired about defendant's destination. Defendant replied that he was heading to the Omega Restaurant in Downers Grove. Officer Opelt asked defendant what street he was on. Defendant replied that he was on 75th Street and also volunteered that he lived on 75th Street. Officer Opelt told defendant that he was in fact on 63rd Street, and then asked defendant why he was traveling on 63rd Street to the Omega Restaurant. Defendant replied that his route was the quickest. Officer Opelt testified that the route defendant was taking to the Omega Restaurant "made absolutely no sense." Because defendant was heading in a "roundabout" way toward his destination, was acting unusually nervous, and had committed the prior driving infractions, Officer Opelt suspected that defendant might have been "under the influence of something." However, Officer Opelt testified that during the conversation he "deemed it not necessary at that point to go ahead with the [field sobriety] tests." Officer Opelt conceded that, in his experience, nervousness is "not such a strong indicator" of intoxication.

Because Officer Opelt did not detect the odor of alcohol, he asked defendant whether he was under the influence of any "street drugs," and defendant replied in the negative. Defendant then volunteered that he had been recently released from drug rehabilitation for a heroin addiction and that he had remained clean since his release.

Officer Opelt suspected that defendant was under the influence of some substance but did not direct defendant to perform any field sobriety tests, because "[i]f [defendant] was under the influence of drugs, [Officer Opelt] didn't feel his condition was enough to warrant an arrest for driving under the influence of a controlled substance." Defendant was not free to leave, but Officer Opelt did not give *Miranda* warnings, because he believed that defendant was not under arrest. Officer Opelt testified that he observed no indications in defendant's physical appearance or demeanor that he was under the influence of drugs. Later in his examination, Officer Opelt acknowledged that only reasonable suspicion is needed to warrant field sobriety tests.

Approximately 10 minutes after the initial stop, Officer Opelt requested consent to search the vehicle, and defendant complied. Meanwhile, a backup officer arrived on the scene, and Officer Opelt asked defendant to step out of the Buick and stand with the backup officer during the search. Officer Opelt conceded that defendant had done nothing to make him fear an imminent attack. Officer Opelt found drug paraphernalia, a pipe used to smoke cocaine, under the front passenger seat of the Buick. Officer Opelt testified that he asked

for consent to search because he believed that "[j]ust because there's not probable cause to make the arrest for driving under the influence of a controlled substance doesn't mean that there's not controlled substances still inside the vehicle."

Upon cross-examination by the prosecutor, Officer Opelt testified that, at the time he asked to search the vehicle, he had not come to a "conclusion of 100 percent surety" of whether defendant was under the influence of drugs. Officer Opelt opined that the presence or absence of contraband in the vehicle would be relevant to determining whether defendant was indeed under the influence of drugs. Although Officer Opelt found the drug paraphernalia and believed that the discovery would be relevant to whether defendant was intoxicated, Officer Opelt never conducted field sobriety tests of defendant. Officer Opelt explained that his lack of training in driving-under-the-influence (DUI) drug detection contributed to his decision to refrain from testing defendant.

At the close of the hearing, defendant argued that there was no traffic violation on which to base the traffic stop and, alternatively, that defendant's consent to the search was tainted because Officer Opelt's request for consent to search the Buick was not reasonably related in scope to the circumstances that formed the basis for the stop. Defense counsel argued, "I think it's pretty clear that asking to search somebody's car for drugs has nothing to do with an alleged weaving within the lane and then [an alleged turn] signal [violation]." The trial court found Officer Opelt to be credible and held that defendant's erratic driving provided an adequate basis to stop him. The court further found that Officer Opelt never exceeded the scope of the stop.

Following a brief bench trial at which little additional evidence was presented, the trial court found defendant guilty of unlawful possession of a controlled substance. Defendant timely appeals.

## ANALYSIS

■ When reviewing a ruling on a motion to quash an arrest and suppress the evidence seized, our standard of review is usually twofold. *People v. Davis*, 352 Ill. App. 3d 576, 579 (2004). We accord great deference to the trial court's factual findings and credibility determinations and reverse those conclusions only if they are against the manifest weight of the evidence, but we review *de novo* the ultimate conclusion of whether suppression is warranted. *People v. Gherna*, 203 Ill. 2d 165, 175 (2003). Where the evidence is undisputed and the only matter challengeable is the trial court's legal conclusion, our review is *de novo*. *People v. Centeno*, 333 Ill. App. 3d 604, 616 (2002).

■ A vehicle stop constitutes a seizure of the vehicle's occupants and is therefore subject to the fourth amendment's requirement of reasonableness as developed in *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). *People v. Gonzalez*, 204 Ill. 2d 220, 226 (2003). Under *Terry*, a law enforcement officer may, within the strictures of the fourth amendment, conduct a brief, investigative stop of individuals, absent probable cause to arrest, provided the officer has a reasonable, articulable suspicion of criminal activity. *Gonzalez*, 204 Ill. 2d at 227. If a detention exceeds what is permissible as a *Terry* investigative stop, a subsequent consent to search may be found to be tainted by the illegality, and the fruits of the search may be suppressed. *People v. Brownlee*, 186 Ill. 2d 501, 519 (1999).

■ A *Terry* analysis includes a dual inquiry: (1) " 'whether the officer's action was justified at its inception' " and (2) " 'whether it was reasonably related in scope to the circumstances which justified the interference in the first place.' " *Gonzalez*, 204 Ill. 2d at 228, quoting *Terry*, 392 U.S. at 19-20, 20 L. Ed. 2d at 905, 88 S. Ct. at 1879. In the trial court, defendant argued that he committed no traffic offense and therefore the traffic stop was unjustified at its inception. The State has not cited any section of the Illinois Vehicle Code (625 ILCS 5/1— 100 *et seq.* (West 2004)) or any other law that defendant might have violated at the time of the stop, and in fact, the trial court speculated that defendant did not violate any traffic law by touching the white lane lines while activating his turn signal. Nevertheless, the trial court found that defendant's "weaving or swerving in the lane" rendered the stop proper at its inception. We need not review this conclusion, because defendant has abandoned his argument that he did not commit a traffic violation. See 188 Ill. 2d R. 341(e)(7) (points not argued in appellant's brief are waived). For the purposes of this analysis, we conclude that the initial traffic stop did not violate defendant's fourth amendment rights.

■ Given defendant's concession that the stop was valid, we need consider only whether Officer Opelt's conduct complied with the second prong of the *Terry* analysis. The second prong is satisfied and the search is valid if (1) the questioning and search were reasonably related in scope to the circumstances that justified the interference in the first place; (2) the officer had a reasonable and articulable suspicion that criminal activity was taking place; or (3) the questioning and search did not impermissibly prolong the detention or change the fundamental nature of the stop. *Gonzalez*, 204 Ill. 2d at 235; *People v. Moore*, 341 Ill. App. 3d 804, 809 (2003) (the officer's question whether there was contraband in the *Terry*-stopped car and subsequent request to search car were subject to the *Gonzalez* requirements).

■ Defendant contends that none of the three alternatives was satisfied. He argues that (1) Officer Opelt's request to search the Buick for contraband was not related to the purpose for which he had stopped the Buick, that is, to determine whether the driver was under the influence; (2) there was no independent reasonable and articulable suspicion justifying the request to search; and (3) Officer Opelt changed the fundamental nature of the stop, which was based on a suspicion of driving under the influence, when he began to investigate whether there was contraband in the Buick.

Our analysis is guided by *Moore*, in which this court recently applied the *Gonzalez* test. In *Moore*, the arresting officer and his partner stopped a car the defendant was driving after they observed it travel down the wrong side of the road at a high rate of speed. After the car came to a halt, the officer approached and conversed with the defendant, who sounded nervous and appeared to be shaking. While running a computer check on the defendant, the officer observed furtive movement from the car's five occupants, who looked liked they were trying to conceal something. Based on this movement, the number of passengers in the car, and the defendant's nervousness, the officer asked the defendant to exit the car. The officer performed a pat-down search of the defendant but found nothing. *Moore*, 341 Ill. App. 3d at 806.

The officer asked the defendant whether there was any contraband in the car, and the defendant replied that he was not aware of any. The officer ascertained that the car was owned by the parents of one of the passengers. The officer requested that passenger's permission to search the car, the passenger consented, and a handgun was discovered under the front passenger seat. By the time the search began, three or four other patrol units had arrived as backup. *Moore*, 341 Ill. App. 3d at 806-07. Later at the station, the officer issued the defendant a citation for improper lane usage. *Moore*, 341 Ill. App. 3d at 807.

We held that the officer's questions about contraband and request to search the car were reasonably related to the circumstances that prompted the stop, because "it was reasonable for [the officer] to suspect that the defendant may have been under the influence of a controlled substance and/or alcohol, or that other criminal activity may have been in progress." *Moore*, 341 Ill. App. 3d at 810. In reaching this conclusion, we emphasized several facts that render this case distinguishable: the defendant was speeding down the wrong side of the road; the defendant lacked any identification or a driver's license; and the officer feared for his safety because the occupants were moving furtively and the defendant did not deny the possibility of weapons

inside the vehicle. *Moore*, 341 Ill. App. 3d at 810. In this case, defendant's "weaving or swerving in the lane" and traveling within five or six feet of another car's bumper are much weaker indicators of driving while under the influence of drugs than the defendant's driving was in *Moore*. Furthermore, it is undisputed that in this case defendant produced a valid driver's license, did not exhibit any physical indicia of intoxication, and did not cause Officer Opelt to fear for his safety. It appears that the defendants in the two cases are similar only in their nervousness, which Officer Opelt conceded is "not such a strong indicator" of intoxication. The cumulative effect of these factors should have tempered Officer Opelt's intrusion.

"*Terry* recognized that officers can detain individuals to resolve ambiguities in their conduct, and thus accepts the risk that officers may stop innocent people." *Moore*, 341 Ill. App. 3d at 808, citing *Illinois v. Wardlow*, 528 U.S. 119, 126, 145 L. Ed. 2d 570, 577, 120 S. Ct. 673, 677 (2000). It is evident from *Moore* that, under *Terry*'s second prong, which asks whether a request to search a *Terry*-stopped car is reasonably related in scope to the circumstances that justified the stop, the court is not limited to considering the situation as it existed at the precise moment the stop occurred. As the officer performs his routine duties following a traffic stop, which typically include questioning the driver about the circumstances leading to the stop and checking the driver's identification, the officer may make observations that justify further detention. Thus, in *Moore*, the circumstances we considered in determining whether the request to search was proper included observations made by the officer as he was performing routine duties after the stop occurred. Such an approach correctly views traffic stops as evolving encounters where new facts continually emerge, feeding into the *Terry* calculus and justifying police action that only moments before would have been unlawful. However, a valid stop for a traffic violation does not grant the officer unfettered discretion to pursue an unarticulable hunch of criminal activity.

Consistent with these principles, we agree with the State that defendant's unexplained misidentification of his location, erratic driving, and unusual nervousness at the time of the stop warranted further questioning to investigate whether defendant was under the influence of alcohol or drugs. However, Officer Opelt concluded that defendant's responses to the questioning rendered field sobriety tests unnecessary to the DUI investigation. Officer Opelt's conscious decision to forgo the field sobriety tests illustrates that the officer's conversation with defendant resolved the ambiguity in defendant's conduct. See *Moore*, 341 Ill. App. 3d at 808.

Officer Opelt's request to search the Buick would have been

reasonably related to the circumstances that prompted the stop if his interaction with defendant had corroborated his initial suspicion that defendant might be under the influence. However, Officer Opelt observed no physical indicia of intoxication, and defendant denied that he was under the influence or possessed any contraband. Most notably, the officer asked to search the vehicle only after defendant volunteered that he had been recently released from drug rehabilitation. The stop and subsequent questioning were justified by defendant's driving and apparent disorientation, respectively. However, Officer Opelt's ultimate request to search the car was not reasonably related to the stop, because the questioning regarding defendant's location and destination was not probative of whether contraband might be found in the car.

We further conclude that Officer Opelt's request to search the car was not justified by a reasonable and articulable suspicion of criminal activity. In *Moore*, the arresting officer testified that, when he returned to his squad car to check the status of the defendant's driver's license, he observed the defendant and his four passengers moving furtively, as if the occupants were trying to hide something. The officer described the movements as coming from the front seat to the backseat. We inferred from the officer's unrebutted testimony that either the defendant or the front passenger was moving something from the front seat to the backseat in an attempt to conceal it. *Moore*, 341 Ill. App. 3d at 811. In light of the perceived safety risk to the officer and the reckless driving, nervous behavior, and lack of identification, we concluded that the request to search the vehicle was justified based on the officer's reasonable, articulable suspicion of criminality. *Moore*, 341 Ill. App. 3d at 811.

This case is distinguishable from *Moore* on this point as well. Here, the traffic stop was supported by facts indicating that defendant might be under the influence. After stopping defendant, Officer Opelt asked him questions about his location and destination, and in responding to these questions, defendant showed unusual nervousness and signs of disorientation. However, neither defendant's behavior nor the visible areas of the car caused the officer to fear for his safety or suspect that defendant possessed contraband. In light of Officer Opelt's decision to forgo sobriety testing, it appears that his hunch regarding concealed contraband in the vehicle was based only on defendant's disclosure of his drug treatment. This suspicion is neither reasonable nor articulable, and therefore it does not justify the request to search the Buick.

We hold that Officer Opelt's request to search the Buick was neither reasonably related to the initial purpose of the stop nor sup-

ported by reasonable and articulable suspicion, and we further conclude that the third *Gonzalez* requirement was not satisfied because Officer Opelt's request changed the fundamental nature of the stop.

The State concedes that, if Officer Opelt was truly investigating whether defendant was under the influence of drugs, he should have simply directed defendant to perform field sobriety tests. We agree, and we further note that the officer might have looked for evidence of drug use by performing a pat-down search of defendant's person. When investigating whether a motorist is under the influence, field sobriety testing is more probative of intoxication than a search of the vehicle or even a pat-down search. The degree to which an officer resorts to less probative investigatory techniques, in this case a request to search a vehicle for evidence of the driver's intoxication, informs our analysis of whether the use of the technique fundamentally changed the nature of the stop. Under the facts of this case, we conclude that Officer Opelt's request to search the car for contraband was a fundamental shift from the purpose of the stop because, based on his interaction with defendant, it was unreasonable for Officer Opelt to suspect that there might be contraband in the Buick.

Only 10 minutes passed between the initial stop and the search, but we need not consider whether Officer Opelt's request to search the car impermissibly prolonged the stop, because we conclude that the request to search violated defendant's fourth amendment rights by fundamentally changing the nature of the stop. *Cf. People v. Bunch*, 207 Ill. 2d 7, 17 (2003) (after concluding that the traffic stop was prolonged impermissibly, the supreme court did not decide whether the officer's conduct changed the fundamental nature of the stop).

Defendant argues that *People v. Hall*, 351 Ill. App. 3d 501 (2004), supports his contention that his rights were violated under *Gonzalez*. We agree. In *Hall*, two officers stopped the defendant because his car's headlight was not functioning. One of the officers informed the defendant of the basis for the stop and then asked for and obtained the defendant's driver's license and proof of insurance. Finding no outstanding warrants, the officer returned the license, issued a verbal warning, and told the defendant he was free to go. The defendant then asked whether he might be pulled over again for the malfunctioning headlight. The officer responded that it was possible that other officers might pull him over. *Hall*, 351 Ill. App. 3d at 502.

The officer then asked the defendant whether he had alcohol, drugs, or weapons in the vehicle. The defendant replied that he did not. The officer asked for permission to search the vehicle. The defendant refused, stating that he was in a hurry to get home. After the defendant refused to allow the search, the officer noticed a pack-

age of cigarette-rolling papers and several plastic "baggies" in the defendant's shirt pocket. The officer asked the defendant to step out of the vehicle. After the defendant did so, the officer ordered him to hand over the items in his shirt pocket. The defendant complied, and the officer found no contraband. The officer then searched the vehicle but found nothing illegal. The officer searched the defendant's pants pocket and, finding marijuana, the officer arrested the defendant. The trial court found that the defendant was unconstitutionally seized when the officer searched the vehicle and the defendant's person. *Hall*, 351 Ill. App. 3d at 502.

On appeal, the State argued that the detention and search were legal under *Gonzalez*. This court disagreed, concluding that the officer exceeded the scope of the *Terry* stop by questioning the defendant about contraband and asking for permission to search the vehicle after telling the defendant that he was free to leave. We concluded that none of the *Gonzalez* prongs was satisfied because (1) the "questions [about contraband] were clearly unrelated to the initial purpose of the stop, the nonfunctioning headlight"; (2) there was no reasonable and articulable suspicion justifying the questioning, because the officer observed the cigarette papers and "baggies" after the questioning began; and (3) the purpose of the stop was completed when the officer gave a warning and told the defendant that he was free to go; thus, further questioning impermissibly prolonged the stop and was simply a "fishing expedition" that changed the fundamental nature of the stop. *Hall*, 351 Ill. App. 3d at 504-05.

*Hall* provides guidance in our analysis of the *Gonzalez* test. In *Hall*, neither the traffic violation for which the defendant was stopped nor anything observed by the officer during his initial interaction with the defendant could have aroused any reasonable suspicion that the defendant was harboring contraband in his car. Thus, the officer in *Hall* had no basis for asking the defendant whether there was contraband in the car. In this case, Officer Opelt stopped defendant on the suspicion of driving under the influence. However, by the time Officer Opelt asked for permission to search the Buick, he had already concluded that defendant did not manifest any physical indicia of intoxication and deemed it unnecessary to administer field sobriety tests. Yet Officer Opelt asked to search the vehicle after deciding that "[j]ust because there's not probable cause to make the arrest for driving under the influence of a controlled substance doesn't mean that there's not controlled substances still inside the vehicle." The officer's own testimony illustrates that his request to search the vehicle was a shift from investigating a traffic violation to investigating drug possession.

For the foregoing reasons, the judgment of the circuit court of Du Page County is reversed.

Reversed.

McLAREN, J., concurs.

PRESIDING JUSTICE O'MALLEY, dissenting:

First, I express my agreement with the majority that the *Terry/Gonzalez* factors must be applied with due regard for the evolving nature of traffic stops. In considering the overarching question of whether police conduct that occurs after the *Terry*-stop of a car is reasonably related in scope to the circumstances that led to the stop, a court may and must consider not only those circumstances that arise before and at the time the traffic stop is effected, but also those that arise afterward, up to the point the police action in question occurs.

By the time Officer Opelt asked defendant for permission to search his car, defendant had (1) weaved within his lane of traffic, failed to signal a turn, and followed another car too closely, all while taking a circuitous route toward his destination, via a street that he erroneously thought was the street on which he lived; (2) acted unusually nervous during the traffic stop; and (3) volunteered that he had been recently released from drug rehabilitation for a heroin addiction. Based on these facts, Officer Opelt asked to search the car. He testified that he made the request because the presence of contraband in the car would corroborate his suspicion that defendant was under the influence of drugs.

The majority suggests that Officer Opelt must have been on a "fishing expedition," because he could have pursued his suspicion more efficiently by simply having defendant submit to field sobriety tests or to a pat-down search for drugs. The majority does not reveal what it believes Officer Opelt really thought during the interaction. Does the majority believe that Officer Opelt did not truly suspect that defendant was under the influence but offered the suspicion merely as a pretext for a search? Or does the majority believe that Officer Opelt's suspicion was actually firmer than he indicated, to the point that he concluded, at least provisionally, that defendant was indeed under the influence of drugs and that he might still have the intoxicating substance in his possession? Of course, it is possible that Officer Opelt undertook the search with mixed rationales. Perhaps he was not so sure that defendant was intoxicated as to arrest him without further proof (which, he reasoned, might take the form of contraband itself), yet he was sure enough to suspect that a search of the car would

reveal the contraband that might have intoxicated defendant. Thus, Officer Opelt might have believed that the presence of contraband in the car would follow from, and in turn reinforce, his suspicion that defendant was under the influence. Whatever the case, Officer Opelt's actions must be evaluated not by what he himself thought was justified, but by what was objectively justified. See, *e.g.*, *People v. Gray*, 305 Ill. App. 3d 835, 839 (1999) (an objective test applies in determining justification under the fourth amendment, and the subjective intentions or beliefs of the officer are not dispositive). Rather than seek to hamstring the State with Officer Opelt's testimony, we must address the issue as framed by the State on appeal: "Was it reasonable for Officer Opelt to believe that a driver whom he suspected to be under the influence of a controlled substance might have some of that same substance in the car with him?" If, as *Terry* and its progeny require in our pursuit of what is objectively reasonable, we yield what is due the judgments of seasoned patrol officers like Officer Opelt, the answer will be "Yes."

The first *Terry/Gonzalez* prong asks whether the police action was reasonably related in scope to the circumstances that justified the interference in the first place. *Gonzalez*, 204 Ill. 2d at 235. The majority and I agree that "defendant's unexplained misidentification of his location, erratic driving, and unusual nervousness at the time of the stop warranted further questioning to investigate whether defendant was under the influence of alcohol or drugs." 359 Ill. App. 3d at 847. As for the request to search the car, the majority initially says that the request "would have been reasonably related to the circumstances that prompted the stop if [the officer's] interaction with defendant had corroborated his initial suspicion that defendant might be under the influence." 359 Ill. App. 3d at 847-48. This statement of the requirements of *Terry/Gonzalez*'s first prong is misleading to the extent that it seems to require Officer Opelt to have had some quantum of evidence to warrant his request. It is the second prong of *Terry/Gonzalez* that requires an evidentiary link between the initial detention and the subsequent police conduct; the first prong requires merely a thematic link. See *Gonzalez*, 204 Ill. 2d at 236 (request for identification from passenger in *Terry*-stopped car did not relate to the traffic violation that was basis for stop); *Hall*, 351 Ill. App. 3d at 504 (officer's question to defendant whether he had any contraband in his car and subsequent request to search car "were clearly unrelated to the initial purpose of the stop, the nonfunctioning headlight"). Fortunately, however, the majority's analysis does not seem governed by this misleading statement, for the majority seems to suggest that the reason Officer Opelt's request to search the car was not reason-

ably related to the initial stop was not because Officer Opelt lacked an evidentiary justification for suspecting that defendant was under the influence, but because he really did not have that suspicion at the time he asked to search the car. The majority reasons that Officer Opelt's decision to forgo sobriety testing indicated that he no longer believed that defendant was under the influence. 359 Ill. App. 3d at 848. The majority misreads the record. Officer Opelt dispensed with sobriety testing because he had concluded there did not exist the probable cause he mistakenly thought was needed for field sobriety tests (see *Village of Plainfield v. Anderson*, 304 Ill. App. 3d 338, 342 (1999) (only reasonable suspicion necessary for field sobriety tests)), not because he had abandoned his belief that defendant was under the influence. Officer Opelt's testimony plainly shows that, at the time he sought permission to search the car, he believed that defendant was under the influence, based on his traffic infractions, obvious disorientation, and admitted recent release from drug rehabilitation. The majority has ventured no reason not to believe Officer Opelt's testimony. Thus, if the majority's doubts about Officer Opelt's sincerity are the only obstacle to its finding the first prong of *Terry/Gonzalez* satisfied, then the record must put that hesitation to rest. In any event, we need not divine Officer Opelt's thoughts, since the test for determining whether police action is justified under the fourth amendment is an objective one. See *Gray*, 305 Ill. App. 3d at 839.

Having said this, I cannot be sure the majority really believes that the reason Officer Opelt's request to search the car was not reasonably related to the initial stop was because his interaction with defendant did not, as the majority incorrectly puts it, "corroborate[ ] his initial suspicion that defendant might be under the influence" (359 Ill. App. 3d at 848), for not five lines after this remark, the majority says, "Officer Opelt's ultimate request to search the car was not reasonably related to the stop, because the questioning regarding defendant's location and destination was not probative of whether contraband might be found in the car" (359 Ill. App. 3d at 848). Does the majority believe that the request to search the car was unreasonable because (1) defendant's answers to Officer Opelt's prior questions did not corroborate his suspicion that defendant was under the influence, or because (2) Officer Opelt's questions were not tailored enough to determining specifically whether defendant had contraband in the car? I addressed the soundness of rationale (1) above. If, in fact, rationale (2) is the intended rationale, then I cannot see why Officer Opelt would have had to ask defendant whether he had contraband in his car before asking to search the car. Both queries would have been based on a suspicion that defendant had contraband, and if, as the

majority apparently believes, it was permissible for Officer Opelt to ask defendant if he had contraband in the car, then surely the officer could have dispensed with preliminaries and simply asked to search the car. Defendant could have declined a request to search his car just as easily as he could have refused to answer a question about his possession of contraband.

There are flaws also in the majority's analysis under the third prong of *Terry/Gonzalez*, which asks whether the fundamental nature of the stop was changed. See *Moore*, 341 Ill. App. 3d at 810. Here again the majority reads more into Officer Opelt's conduct than the record allows. The majority states that "[i]n light of Officer Opelt's decision to forgo sobriety testing, it appears that his hunch regarding concealed contraband in the vehicle was based only on defendant's disclosure of his drug treatment." 359 Ill. App. 3d at 848. Again, Officer Opelt was quite clear that his suspicion was based on several factors, namely, defendant's driving infractions, disorientation, and admission to having undergone drug treatment recently. But even if Officer Opelt's "hunch" had been based solely on the drug treatment disclosure, that should not matter to our analysis. The correct analytical approach is whether a reasonable officer would have been influenced by the other foregoing factors, which I believe continued to influence Officer Opelt.

Later in the analysis, the majority finds yet more significance in what methods Officer Opelt did not employ. Pointing out that Officer Opelt would have more directly pursued the issue of intoxication by having defendant perform field sobriety tests or submit to a pat-down search for contraband, rather than by asking to search the car, the majority states the following proposition: "The degree to which an officer resorts to less probative investigatory techniques, in this case a request to search a vehicle for evidence of the driver's intoxication, informs our analysis of whether the use of the technique fundamentally changed the nature of the stop." 359 Ill. App. 3d at 849. No specific citation is provided for this proposition. The majority apparently believes that it is a logical, uncontroversial elaboration of *Terry/ Gonzalez*, but I am doubtful. Some of the most invasive police actions—those most likely to change the fundamental nature of a stop— are also the most probative.

At this early point in its existence, *Gonzalez* itself remains the best guide to what *Gonzalez* says: " '*Terry*'s scope requirement is a common sense limitation on the power of law enforcement officers. It prevents law enforcement officials from fundamentally altering the nature of the stop by converting it into a general inquisition about past, present and future wrongdoing.' " *Gonzalez*, 204 Ill. 2d at 235,

quoting *United States v. Holt*, 264 F.3d 1215, 1240 (10th Cir. 2001) (Murphy, J., concurring in part and dissenting in part). Defendant was not subjected to a general inquisition, but to questions tailored for the narrow purpose of determining whether he was under the influence. To say, as does the majority, that Officer Opelt could have used a more probative method of pursuing his suspicion is to say nothing more than that Officer Opelt's conduct fell on a continuum. Where does *Terry/Gonzalez* draw the line on that continuum? The overarching criterion is common sense, and where an officer seeks to know whether a driver he suspects is under the influence of drugs has any such drugs in his possession, common sense is not offended but upheld. The majority would have preferred that Officer Opelt perform field sobriety tests or pat defendant down for contraband, but such methods are much more personally invasive than a request to search a car.

While I believe that Officer Opelt's actions clearly were justified under the first and third prongs of *Terry/Gonzalez* and therefore pass constitutional muster on that basis alone, I will discuss the second prong as it relates here, because I disagree with the majority on this point as well. The second prong asks whether the officer's action was supported by a reasonable and articulable suspicion of criminal activity. *Gonzalez*, 204 Ill. 2d at 235. The majority contends that "neither defendant's behavior nor the visible areas of the car caused the officer to fear for his safety or suspect that defendant possessed contraband." 359 Ill. App. 3d at 848. The majority acknowledges, however, that defendant, in addition to having driven erratically, "showed unusual nervousness and signs of disorientation." 359 Ill. App. 3d at 848. These facts, combined with defendant's admission to having been in drug treatment recently, supported a reasonable suspicion that defendant was under the influence of drugs, even in the absence of the more commonly observed physical indicia of alcohol influence such as bloodshot and glassy eyes or lack of balance. That being so, Officer Opelt was justified in inquiring whether he could search the car, because, as I explained above, it was reasonable to suspect that defendant might have in his possession the same contraband that might have intoxicated him.

The majority's analysis of the relevant case law is also unconvincing. Contrary to the majority's claim, the present case is nothing like *Hall*, where the officer asked to search the defendant's car without having any indication that the defendant was guilty of anything other than the equipment violation for which the officer pulled him over. Here, by contrast, there were various signs that defendant was under the influence of drugs. The majority also fails to identify any material difference between this case and *Moore*. I disagree with the majority's

conclusion that defendant's weaving within his lane and following another car too closely are "much weaker" indicators of driving under the influence than the erratic driving in *Moore*, which consisted of driving down the wrong side of the road at a high rate of speed. 359 Ill. App. 3d at 847. Defendant's driving was at least as telling of impairment as the *Moore* defendant's driving, if not more so. Weaving within one's lane is such a common and probative indicator of driving under the influence that this district has formulated the following general rule: "Weaving, even within defendant's own lane, may provide reasonable grounds for a *Terry* stop where the officer believes defendant may be under the influence of drugs or alcohol." *People v. Rosemeier*, 259 Ill. App. 3d 695, 697 (1994). I recognize that, unlike here, the officer in *Moore* observed furtive movements within the car. However, although the court in *Moore* considered the totality of the circumstances in judging the officer's questioning and request to search the car, it seems the court would have found the officer's action justified even if there was reason to suspect only that the defendant (the driver of the car) was under the influence: "Given these circumstances, it was reasonable for Officer Owens to suspect that the defendant may have been under the influence of a controlled substance and/or alcohol, *or* that other criminal activity may have been in progress. *** Consequently, we believe the scope of the stop was related to the circumstances that justified the interference in the first place." (Emphasis added.) *Moore*, 341 Ill. App. 3d at 810. Moreover, there was a fact present here that was absent in *Moore*: defendant's admission that he had been in drug rehabilitation recently.

For the foregoing reasons, I respectfully dissent from the majority's holding that Officer Opelt exceeded the scope of the *Terry* stop.