THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. SHINARA MATTHEWS, Defendant-Appellee.

Third District No. 3—04—0293

Opinion filed June 2, 2005.

Jeff Tomczak, State's Attorney, of Joliet (Lawrence M. Bauer and Gary F. Gnidovec, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Scott Reich, of Reich & Orloff, of Joliet, for appellee.

JUSTICE HOLDRIDGE delivered the opinion of the court:

Shinara Matthews, defendant, was charged with aggravated unlawful use of a weapon (720 ILCS 5/24—1.6 (West 2002)). She filed a motion to quash her arrest and suppress evidence that was seized

during a traffic stop. In the motion, she alleged that the arresting officer unlawfully exceeded the original purpose of the traffic stop (burnt-out license plate light) by questioning her about the contents of the car. The matter proceeded to an evidentiary hearing, and the judge ultimately granted defendant's motion. The State filed this appeal. We affirm.

## BACKGROUND

Defendant testified that on July 1, 2003, between 12:50 a.m. and 1 a.m., she received a telephone call from Jeremiah Bell requesting a ride home. Using her sister's car, defendant left her residence with Antonio Edwards and drove to 603 Elmwood Street (Joliet), where Bell was waiting. The trip took approximately 10 minutes. Bell entered the car and sat in the backseat on the passenger side. Edwards was in the front passenger seat. Defendant drove north toward Bell's residence and stopped for a stop sign at the intersection of Miles and 4th Streets. She saw a police car across the intersection facing south. She made a left turn through the intersection and proceeded west on 4th Street. The police car made a sharp right turn and began following defendant almost immediately. About seven seconds later, the officer driving the police car activated his overhead lights. Defendant testified that she pulled over within two blocks after the lights were activated.

According to defendant, two police officers approached the car. Officer Voudrie, who held a flashlight in one hand and a weapon in the other hand, stated: "Freeze! Everyone put their hands in the air." While the other officer spoke to Edwards, Voudrie spoke to defendant and immediately asked if there was anything illegal in the car. Defendant inquired whether "this [was] a traffic stop," and Voudrie said yes, explaining that he made the stop because her rear license plate light was out.

Voudrie asked for defendant's driver's license and proof of insurance. Defendant did not have a driver's license or proof of insurance with her, but she did produce a firearm owner's identification (FOID) card. According to defendant, Voudrie pulled her out of the car and asked if there were any weapons inside. After about one minute of interrogation on the subject of weapons, defendant acknowledged that she had a gun in the car. Bell and Edwards were then removed from the car, and a dog was retrieved from a canine unit (which had arrived immediately after Voudrie effected the stop). The officers searched the car, found her gun, and arrested her. In her testimony, defendant acknowledged knowing that her gun was beneath the driver's seat and that ammunition was in the center console. However, she denied knowledge of two other guns that were found in the car.

Bell testified that defendant picked him up at approximately 1 a.m. After entering the car, he lay down in the back passenger-side seat and fell half asleep. Later, defendant announced that a police car was behind them, and Bell sat up a little to see what was happening. Defendant drove a little farther and then pulled over. Bell testified that two police officers approached the car, both holding a flashlight in one hand and a gun in the other hand, and both telling the occupants to put their hands in the air. Within seconds, defendant was ordered to exit the car. She complied and walked to the rear of the car, where she continued conversing with one of the officers while the other officer held his gun on Bell and Edwards. After about one minute, Bell and Edwards were told to exit the car. The officers brought in a dog and advised that the dog alerted to something in the car. The police eventually told Bell that they found other weapons in the car.

Bell testified that he leaned forward when he discovered the police lights behind the car. Then he straightened up when the police told him to raise his hands. He was half asleep at the time. He never tried to reach under the seat, kick anything under the seat, or reach for the center console.

Edwards testified consistently with defendant about the events leading up to the stop. He said two police officers approached the car with flashlights and guns drawn, telling the occupants to put their hands up. A canine unit arrived within 15 seconds, and two additional units arrived within 10 more seconds. Defendant was asked for her driver's license and proof of insurance, but she was only able to produce a State of Illinois identification card. Defendant was then asked to exit the car. She complied and walked to the rear of the car, where she had a conversation with one of the officers. Approximately 30 seconds later, Edwards was directed to exit the car and sit on a curb. After he and Bell exited the car, the officers brought a dog and conducted a search. They subsequently handcuffed Edwards, advising that he was under arrest for unlawful use of weapons. Edwards testified that he saw the officers retrieve a gun from beneath the driver's seat and ammunition from the center console, but he did not see them retrieve a gun from beneath the passenger's seat.

Officer Voudrie testified that he was working alone on July 1, 2003, at 2:58 a.m., when defendant's car passed him with no rear registration light. The car was traveling from an area known for high drug activity. Voudrie activated his overhead lights to make a traffic stop, and defendant drove for three blocks before stopping, although she could have stopped sooner. Voudrie called in the stop and advised that the car had two occupants, which would have prompted dispatch to send backup. He approached the car with a flashlight and realized

that a third person was in the rear passenger-side seat. The rear passenger was leaning forward and down toward the front passenger seat. He leaned back when Voudrie arrived but kept his hands somewhat between his knees. Uncertain of the situation, Voudrie asked the rear passenger to show his hands. The rear passenger complied by placing his hands on the front seat headrest. The two other occupants raised their hands as well, although Voudrie testified that he was not concerned with them at the time. He explained that his standard procedure during a traffic stop is to "clear" the vehicle by working from the back to the front seat.

According to Voudrie, he immediately proceeded with the traffic stop and asked defendant for her driver's license and proof of insurance. Defendant advised that she did not have insurance, and she produced a FOID card and a State of Illinois identification card instead of her driver's license. Voudrie testified that defendant was visibly shaking at the time. He also said defendant continued looking for an insurance card despite her previous statement that she did not have insurance. Based on the actions of defendant and the rear passenger, Voudrie asked defendant to exit the car, which she did. Voudrie never touched defendant in the process. He asked why she was so nervous and whether there was anything in the car that was not supposed to be there. He also asked for permission to search the car. Defendant responded that the car did not contain anything illegal and that Voudrie could not search it. Voudrie then advised that, based on the conduct of defendant and the rear passenger, he was going to search the car anyway. During the evidentiary hearing, Voudrie was asked why he requested consent if he already had a basis for searching the car. He said he just wanted to see how defendant would react.

After the two passengers were removed from the car, a dog performed a walk-around and alerted on the driver's door. Voudrie informed defendant of the alert, and she advised that a gun was under the driver's seat and a loaded clip was in the center console. She said her possession of the gun was all right because she had a FOID card. Voudrie retrieved the gun and the clip. He testified that 10 to 15 minutes elapsed between the initial stop and the dog's alert on the car. Another officer retrieved two additional loaded guns from the car (one under the passenger's seat and one under the driver's seat toward the rear). Voudrie denied ever pulling his service revolver during the stop. He issued two traffic citations to defendant: one for driving with no rear registration light, and one for failing to give proof of insurance. In his subsequent police report, he said he was suspicious and "believed there to be illegal narcotics in the vehicle."

Officer Olson (canine officer) testified that on July 1, 2003, at

about 2:58 a.m., he heard a radio transmission about Voudrie stopping a car with occupants. Knowing that Voudrie was alone, Olson drove to the area and arrived within one to two minutes. Upon his arrival, Olson saw Voudrie talking to the driver of the car and another officer approaching the passenger side. None of the officers had their weapons drawn. Within 45 seconds of arriving at the scene, Olson had a conversation with Voudrie in which Voudrie requested a canine search. The occupants were removed from the car, and Olson performed a walk-around with the dog. The dog alerted on the driver's door handle. Olson advised Voudrie that the alert was for narcotics and that a search should be preformed. Voudrie entered the car and retrieved a gun from beneath the driver's seat. Then he asked Olson to perform an interior search with the dog. Olson searched the interior and found a gun beneath the front passenger seat, another gun beneath the back part of the front passenger seat, and cannabis stems and seeds between the front seats.

After hearing this evidence, the judge granted defendant's motion to quash her arrest and suppress the evidence seized during the traffic stop. The State filed this appeal.

## STANDARD OF REVIEW

We accord great deference to the trial court's factual findings, and we will not reverse those findings unless they are against the manifest weight of the evidence. *People v. Sorenson*, 196 Ill. 2d 425 (2001). In other words, we review only for manifest error on questions regarding factual determinations and credibility assessments. *People v. Anthony*, 198 Ill. 2d 194 (2001). On the ultimate question of whether a motion to suppress should be granted, however, we apply *de novo* review. *Sorenson*, 196 Ill. 2d 425.

## DISCUSSION

■ Under the standard drawn from *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968), a traffic stop must satisfy two elements to qualify as reasonable for fourth amendment purposes. First, the police officer's action in initiating the stop must be justified; and second, the officer's conduct during the stop must be reasonably related in scope to the circumstances that justified the interference in the first place. *People v. Bunch*, 207 Ill. 2d 7 (2003). Also according to *Terry*, a police officer may conduct a search for weapons if he has reason to believe that a suspect is armed and dangerous. *Terry*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868. Furtive movements by an occupant of a vehicle may justify a search of the vehicle for weapons, irrespective of whether the officer questions and frisks the occupant before conducting the search. *People v. Rodriguez*, 154 Ill. App. 3d 401 (1987).

■ Regarding an officer's questioning during a routine traffic stop, our supreme court has explained:

"[I]n determining whether police questioning during the course of a traffic stop satisfies *Terry*'s scope requirement, we must consider, as an initial matter, whether the question is related to the initial justification for the stop. If the question is reasonably related to the purpose of the stop, no fourth amendment violation occurs. If the question is not reasonably related to the purpose of the stop, we must consider whether the law enforcement officer had a reasonable, articulable suspicion that would justify the question. If the question is so justified, no fourth amendment violation occurs. In the absence of a reasonable connection to the purpose of the stop or a reasonable, articulable suspicion, we must consider whether, in light of all the circumstances and common sense, the question impermissibly prolonged the detention or changed the fundamental nature of the stop." *People v. Gonzalez*, 204 Ill. 2d 220, 235 (2003).

■ In the instant case, although the trial judge did not enumerate specific findings of fact, her ruling obviously signals that her findings favored defendant.

The State argues that we should analyze Officer Voudrie's search of the car under *Terry* principles rather than *Gonzales* principles. According to the State, Voudrie's questioning of defendant about contraband is not determinative because, at the time of the questioning, he was already justified in conducting a *Terry* search.

The facts are in dispute regarding when Voudrie began questioning defendant about contraband. According to defendant's testimony, Voudrie's first question addressed the topic of possible illegal items in the car. This is why defendant inquired as to whether the detention was a traffic stop. Only afterward, according to defendant, did Voudrie ask for her driver's license and proof of insurance. Voudrie testified, however, that he initially asked for the usual documents and only later began asking about possible illegal items in the car.

On this issue, we see no reversible error in a credibility determination favoring defendant. According to the State, however, this issue should not matter because Voudrie observed Bell's conduct in the backseat (furtive movement) before asking any questions at all. The State describes Bell's conduct as "the sole fact that was determinative in this case." As noted above, furtive movements by an occupant of a vehicle may justify a search of the vehicle for weapons. *People v. Rodriguez*, 154 Ill. App. 3d 401 (1987). The State asserts that Voudrie's search was justified under this principle.

After considering this argument, we decline to reverse the trial judge's suppression order.

The record contains a second factual dispute regarding events that occurred before Officer Voudrie observed Bell in the backseat of the car. Voudrie testified that he never drew his service weapon during the stop. However, defendant testified that when Voudrie approached the car, he held a flashlight in one hand and a weapon in the other hand. Bell and Edwards gave similar testimony, stating that both officers who approached the car had their weapons drawn. Edwards further testified that four police vehicles, one containing a drug dog, were on the scene within seconds of when Voudrie approached the car. Moreover, Voudrie's testimony shows that he knew defendant was driving from a high drug area, and his police report shows that he suspected that the car contained illegal narcotics.

This evidence supports a reasonable inference that the officers' conduct, from the outset of the detention, focused on drug interdiction and was thus unrelated to the purpose of the stop (burnt-out light).

Other evidence on the *Terry* issue also supports inferences in defendant's favor. The sole justification for a *Terry* search is protection of the police officer and others in the vicinity. *Sorenson*, 196 Ill. 2d 425. Yet when Voudrie observed Bell lean forward (the conduct that allegedly justified a *Terry* search), he did not search the car at all. Instead, according to his testimony, he proceeded to investigate the burnt-out light. As noted above, defendant testified that Voudrie's first question was about contraband rather than a traffic infraction. In either event, however, Voudrie continued his traffic stop routine (and even requested defendant's consent to search) rather than searching the car to abate the alleged threat to officer safety. Moreover, *Terry* does not authorize a search for evidence (*Sorenson*, 196 Ill. 2d 425), and Voudrie used a drug dog to conduct his search.

The State cites *Illinois v. Caballes*, 543 U.S. 405, 160 L. Ed. 2d 842, 125 S. Ct. 834 (2005), where the United States Supreme Court held that police officers do not need a separate reasonable, articulable suspicion to walk a drug dog around a vehicle during a routine traffic stop. At the same time, however, the State argues that Voudrie's use of the dog *was* supported by a separate, reasonable suspicion. More importantly, the instant case simply does not present a *Caballes* scenario. The dog was not walked around the car merely to see if a search could occur; Voudrie had already decided to conduct the search, and the dog was his tool for doing so. Thus, if the decision to search does not satisfy fourth amendment principles, the decision cannot be saved merely because Voudrie used a dog.

In light of the foregoing discussion, we decline to reverse the trial judge's ruling.

## CONCLUSION

The judgment of the Will County circuit court is affirmed.

Affirmed.

SLATER, P.J., and BARRY, J., concur.