No. 2--05--0132        Filed 3/29/06

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 04--CF--0898 |
| HUGO MENDOZA, | ) ) ) | Honorable Patricia Piper Golden, |
| Defendant-Appellee. | ) | Judge, Presiding. |

_____

JUSTICE McLAREN delivered the opinion of the court:

Two Aurora police officers pulled over defendant, Hugo Mendoza, to investigate two minor violations of the Illinois Vehicle Code. After the traffic stop was completed, one of the officers began asking Mendoza questions unrelated to the ostensible reason for the stop (that is, the minor violations of the Illinois Vehicle Code). The second officer, meanwhile, began shining his flashlight into Mendoza's car. The second officer saw a handgun sticking out from under the front seat, and Mendoza was eventually arrested and charged with unlawful use of a weapon (720 ILCS 5/24--1.6(a)(1), (a)(3)(A) (West 2002)). He filed a motion to suppress, arguing that the officers' actions violated his constitutional right to be free from unreasonable search and seizure. See U.S. Const., amend. IV; Ill. Const. 1970, art. I, §6. The trial court granted the motion, and the State appeals. We affirm.

## I. BACKGROUND

### A. The Facts Before the Trial Court

The following facts are taken from testimony presented at a hearing on Mendoza's motion to suppress. Around 11 p.m. on May 10, 2004, Mendoza was driving his Pontiac Grand Prix sedan in Aurora. As he drove through the 800 block of Lebanon Street, Mendoza was watched by two Aurora police officers, Investigator Jeff Wiencek and Investigator Joe Weber, who were patrolling the area in a semi-marked police vehicle. The officers did not see Mendoza speeding. Nor did they see him driving erratically. However, they did see that he had a tinted rear window, a tinted rear license plate cover, and a bandana hanging from his rearview mirror. Having a tinted rear window is not an Illinois Vehicle Code violation, but having a tinted rear license plate cover is (see 625 ILCS 5/3--413(b) (West 2002)). So, too, is having an object hanging from the rearview mirror, if that object materially obstructs the driver's view (see **625 ILCS 5 12--503** c **West 2002**, and the officers believed that the bandana hanging from **M**endoza s rearview mirror was large enough to obstruct his view.[1] After making these observations, the officers suspected two things. First, they suspected that Mendoza was violating the Illinois Vehicle Code. Second, they suspected that he was a gang member. The latter suspicion was based on Aurora's being a city where gang activity has occurred and on the bandana hanging from Mendoza's

---

[1] The trial court found that there was no evidence that the officers thought that the bandana was obstructing Mendoza's view. However, according to the officers' testimony, which was the only evidence before the trial court, the officers thought that the bandana was large enough to obstruct Mendoza's view. Thus, the trial court's factual finding to the contrary was mistaken. But, as discussed in part IIA below, this mistake is not significant.

rearview mirror. That bandana was red, and, according to the officers, red is one of the colors of a gang known as the Vice Lords. It is not, however, the only color, and the officers did not say that non-gang members never hang red bandanas from their rearview mirrors. Nevertheless, based on the area and the bandana, the officers suspected Mendoza of being a gang member. And they decided to pull him over.

Investigator Weber activated the police vehicle's emergency lights, and Mendoza quickly stopped. At that point, the two officers got out of their vehicle and approached his car. Investigator Weber came up on the driver's side; Investigator Wiencek, on the passenger's. They wore dark, special-operations uniforms, with "POLICE" stenciled in large white letters on their shirts. Their badges were not visible, but their guns were. Their police radios blared. Shining his flashlight into the car, Investigator Weber asked Mendoza for his driver's license and proof of insurance. Meanwhile, on the passenger's side of the car, Investigator Wiencek peered in at Mendoza and looked around at the backseat of the car. Neither officer saw anything unusual.

Mendoza handed his license and proof of insurance to Investigator Weber, and both officers returned to their police vehicle. Investigator Weber determined that Mendoza's driver's license and insurance were valid. Then he ran a criminal history check on Mendoza and came up with nothing. Nevertheless, Investigator Weber decided that he would try to get Mendoza to consent to a search of his car.

Investigator Weber did not want to search Mendoza's car because Investigator Weber or Investigator Wiencek had observed any criminal activity beside the Illinois Vehicle Code violations; they had observed none. Nor did Investigator Weber want to search Mendoza's car because they suspected his involvement in some specific past crime; they

had no such suspicions. Instead, Investigator Weber wanted to search Mendoza's car because Investigator Weber and Investigator Wiencek believed that Mendoza was "affiliated" with the Vice Lords gang. They based this belief on "information" apparently on file at the Aurora police department and on Investigator Wiencek's having previously seen Mendoza hanging out in the same place as some gang members. Also, there was Mendoza's having a red bandana hanging from his rearview mirror and his having been pulled over in Aurora, where there had been some shootings in the past. Neither Investigator Weber nor Investigator Wiencek had any information linking Mendoza to those shootings--or any other crime, for that matter--but the officers did think that someone who has been seen in the same place as gang members, and who has a red bandana in his car, and who is caught driving in Aurora, might have a gun in his car; so they felt a "heightened need for safety." Notwithstanding all of this, however, the officers apparently did not believe they had any legal justification to search Mendoza's car for a gun or anything else. Hence, Investigator Weber's plan to get Mendoza to consent to a search.

With this end in mind, the officers again approached Mendoza's car. As before, the officers flanked Mendoza's car. Also as before, Investigator Weber went to the driver's side and Investigator Wiencek went to the passenger's. Investigator Weber told Mendoza that he, Investigator Weber, was not going to give Mendoza a ticket. At that point, Investigator Weber returned Mendoza's insurance information and driver's license. But, as planned, Investigator Weber did not tell Mendoza he was free to go. Instead, Investigator Weber began questioning Mendoza.[2] As Investigator Weber did so, his partner, Investigator Wiencek, stood at the passenger's side, shining his flashlight around in Mendoza's car.

---

[2]The trial court found that, before questioning Mendoza, Investigator Weber asked him to

step out of his vehicle.  However, neither officer testified that this occurred, and, as their testimony was the only evidence before the trial court, the trial court's factual finding on this point was mistaken.  But, as discussed in part IIA below, this mistake is not significant.

Back at the driver's side, Investigator Weber asked Mendoza if he had anything illegal in the car. Mendoza answered that he did not. Investigator Weber then asked Mendoza if the officers could search the car. Mendoza answered that they could not. Finally, Investigator Weber told Mendoza he could go. Mendoza then began to drive away. He did not speed away. He did not screech his tires. He simply started off at a normal rate of speed.

He would not get far. As soon as Mendoza pulled away, Investigator Wiencek told Investigator Weber that he had seen the butt of a handgun sticking out from under the driver's seat of Mendoza's car. Investigator Wiencek later testified that, before seeing the gun, he had heard Investigator Weber ask Mendoza if the officers could search his car. After Investigator Wiencek saw the gun, he had tried to alert Investigator Weber without alerting Mendoza, but he had failed to do so, and Investigator Weber had permitted Mendoza to drive away. After Investigator Wiencek told Investigator Weber about the gun, the two officers jumped back into their vehicle and chased Mendoza down. They ordered him out of the car and searched him. They found nothing on his person, but in his car they found a handgun. Then they arrested him.

B. The Trial Court's Legal Analysis

After considering the above evidence, the trial court concluded that the discovery of the gun stemmed from a violation of Mendoza's right to be free from unreasonable search and seizure. See U.S. Const., amend. IV (protecting against unreasonable search and seizure); see also Ill. Const. 1970, art. I, §6 (same).[3] To reach this conclusion, the trial

---

[3]Defendant filed his motion to suppress under both the Illinois and United States Constitutions. As a general rule, our supreme court interprets article I, section 6, of the Illinois

court used the analytical framework set out by the supreme court in People v. Gonzalez, 204 Ill. 2d 220 (2003), and applied by this court in People v. Parra, 352 Ill. App. 3d 584 (2004). As discussed in part IIB below, although the trial court's ultimate conclusion was correct, the trial court's analysis was not. However, to understand why, it is helpful to review that analysis in detail.

Under Gonzalez, the constitutionality of police conduct during a traffic stop is analyzed using the two-step inquiry set out by the United States Supreme Court in Terry v. Ohio, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). The first step is to determine whether the actions of the police were justified at their inception. Terry, 392 U.S. at 19-20, 20 L. Ed. 2d at 905, 88 S. Ct. at 1879. In the traffic stop context, the actions of the police are justified at their inception if the police reasonably suspect a violation of the traffic laws. Gonzalez, 204 Ill. 2d at 227-28. This is so even if the real reason for stopping the driver is

_____

Constitution consistently with the United States Supreme Court's interpretation of the fourth amendment to the United States Constitution. See People v. Gherna, 203 Ill. 2d 165, 176 (2003). Thus, for the convenience of the reader, our analysis will refer to only the fourth amendment.

something other then the suspected traffic violation--say, to investigate possible gang activity.  See People v. Lomas, 349 Ill. App. 3d 462, 467 (2004).  If the actions of the police were justified at their inception, the court moves on to the second step of the Terry inquiry.  In this step, the court must determine whether the actions of the police were "reasonably related in scope to the circumstances which justified the interference the first place."  Terry, 392 U.S. at 20, 20 L. Ed. 2d at 905, 88 S. Ct. at 1879; see also Gonzalez, 204 Ill. 2d at 228.  To determine whether police questioning during a traffic stop is constitutional under the second step of the Terry inquiry, Illinois courts apply a three-prong analysis.  Gonzalez, 204 Ill. 2d at 235; Parra, 352 Ill. App. 3d at 587.  First, the court must determine whether the questions related to the initial purpose of the stop.  Gonzalez, 204 Ill. 2d at 235.  If so, they did not violate the fourth amendment.  Gonzalez, 204 Ill. 2d at 235.  Second, if the questions were not related to the initial purpose of the stop, the court must determine whether the questions were justified by a "reasonable, articulable suspicion" of criminal activity other than the mere traffic violation.  Gonzalez, 204 Ill. 2d at 235.  If so, the questions did not violate the fourth amendment.  Gonzalez, 204 Ill. 2d at 235.  Third, in the absence of either a connection to the purpose of the stop or a reasonable suspicion of additional criminal activity, the court must determine whether, "in light of all the circumstances and common sense, the question[s] impermissibly prolonged the detention or changed the fundamental nature of the stop."  Gonzalez, 204 Ill. 2d at 235.  If so, then the questions violated the fourth amendment.  See Gonzalez, 204 Ill. 2d at 235.  When the fourth amendment has been violated, the evidence obtained as a result is subject to suppression.  Mapp v. Ohio, 367 U.S. 643, 649, 6 L. Ed. 2d 1081, 1086, 81 S. Ct. 1684,

*1688 1961 People v. Winsett, 153 Ill. 2d 335, 341 1992 People v. Kipfer, 356 Ill. App. 3d 132, 143 2005.*

In this case, the trial court found that, based on the officers' observation of at least one violation of the Illinois Vehicle Code, the stop of Mendoza satisfied the first step of the Terry inquiry. See Terry, 392 U.S. at 19-20, 20 L. Ed. 2d at 905, 88 S. Ct. at 1879; Gonzalez, 204 Ill. 2d at 227-28. However, the trial court found that Investigator Weber's questioning of Mendoza did not satisfy the second step of the Terry inquiry. As noted, Investigator Weber asked Mendoza if he had anything illegal in his car, and, when Mendoza said no, Investigator Weber asked if he could search the car. The trial court found that these questions were not related to the initial purpose of the stop. See Gonzalez, 204 Ill. 2d at 235. Next, the trial court found that the questions were not justified by a reasonable suspicion of additional criminal activity. See Gonzalez, 204 Ill. 2d at 235. In so finding, the trial court reasoned that a reasonable suspicion of some specific criminal activity did not exist simply because Mendoza was caught driving in Aurora with a red bandana hanging from his rearview mirror. This was so, the trial court reasoned, even though the officers had "information" that Mendoza was somehow "affiliated" with a gang. Finally, having concluded that the questioning was not justified based on either the purpose of the stop or a reasonable suspicion of additional criminal activity, the trial court concluded that the questioning both impermissibly prolonged the traffic stop and changed its fundamental nature. See Gonzalez, 204 Ill. 2d at 235. Therefore, the trial court found that a fourth amendment violation had occurred. Since the gun in Mendoza's car was not discovered until the police violated the fourth amendment, the trial court found that the gun would not have been discovered absent the violation. Accordingly, the trial court granted

Mendoza's motion to suppress. *See Winsett*, 153 Ill. 2d at 341. The State appeals that decision.

## II. ANALYSIS

### A. Standard of Review

Review of a trial court's ruling on a motion to suppress presents a mixed question of law and fact. People v. Jones, 215 Ill. 2d 261, 267 (2005). On the fact side of the analysis, we uphold the trial court's findings unless they are against the manifest weight of the evidence. People v. Pitman, 211 Ill. 2d 502, 512 (2004). On the legal side, we review de novo the trial court's ultimate conclusion as to whether the evidence should have been suppressed. People v. Sorenson, 196 Ill. 2d 425, 431 (2001).

Here, the State correctly points out that the trial court made two erroneous factual findings. Specifically, as footnoted in part IA above, the trial court erroneously found that the officers did not suspect that the bandana hanging from Mendoza's rearview mirror obstructed his view, and that, prior to questioning Mendoza about illegal items or asking to search his car, Investigator Weber asked Mendoza to step out of his car. In fact, the officers' testimony, which was the only evidence before the trial court, showed just the opposite--that is, they suspected that the bandana obstructed Mendoza's view, and Investigator Weber did not, at least at that point, ask Mendoza to step out of the car. Thus, the trial court's factual findings to the contrary were against the manifest weight of the evidence. Consequently, we reject them. Pitman, 211 Ill. 2d at 512.

However, we also reject the State's argument that these factual mistakes were material. Additionally, we reject the State's argument that, assuming these mistakes were material, reversal must automatically follow.

First, contrary to the State's argument, the trial court's factual mistakes were not material. With regard to the suspected bandana obstruction, the trial court did not hold that, because the bandana did not obstruct Mendoza's view, the officers' stopping of Mendoza was improper. To the contrary, the trial court recognized that, based on Mendoza's tinted rear license plate cover, the officers had a constitutional justification for stopping Mendoza, bandana obstruction or no. See 625 ILCS 5/3--413(b) (West 2002). As the trial court put it, "the officers had a reason to stop the vehicle and that comes from the tinted license plate." See Whren v. United States, 517 U.S. 806, 810, 135 L. Ed. 2d 89, 95, 116 S. Ct. 1769, 1772 (1996) (stating that, *a s a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred*"); see also Gonzalez, 204 Ill. 2d at 227-28 (stating that a traffic stop is constitutional if it is based on reasonable suspicion or probable cause to believe the traffic laws have been violated). Having recognized as much, the trial court granted the motion to suppress not because it believed the stop was improper, but because it believed what occurred after the stop was improper. Thus, the trial court's mistake about the bandana was not material to its decision.

Neither was the trial court's mistaken finding that, before questioning Mendoza, Investigator Weber asked him to get out of his car. The trial court granted the motion to suppress not because it believed that this occurred, but because, as detailed in part IB above, it believed that the questioning itself was constitutionally impermissible.[4] Thus, neither of the trial court's factual mistakes was material.

---

[4]There is no dispute that, during a lawful traffic stop, police officers may order the driver out of his or her vehicle. Sorenson, 196 Ill. 2d at 433 (noting that *it is well established*

No. 2--05--0132

In an effort to get around this conclusion, the State relies on *People v. Brodeur*, 189 Ill. App. 3d 936 1989 . There, this court reversed the trial court s judgment that there had not been probable cause to arrest the defendant for driving under the influence. In the trial court, a police officer had testified that, prior to arresting the defendant, he observed that she had bloodshot eyes, slurred speech, and smelled of alcohol. *Brodeur*, 189 Ill. App. 3d at 938. Although the officer s testimony was uncontradicted, the trial court found that the officer had not observed any indicia of drunkenness until after he arrested the defendant. *Brodeur*, 189 Ill. App. 3d at 939-40. Because this factual mistake led directly to the trial court s legal conclusion that the officer lacked probable cause for the arrest, this factual mistake was clearly material to the trial court s decision.

---

that following a lawful traffic stop, police may, as a matter of course, order the driver and any passengers out of the vehicle pending completion of the stop without violating the protections of the fourth amendment  *People v. Staple*, 345 Ill. App. 3d 814, 820 (2004) (same).  Nothing in the record indicates that the trial court failed to grasp this basic legal concept.

*Brodeur* is of no help to the State here. To begin with, *Brodeur* did not even involve a motion to suppress. And, more importantly, the trial court's mistake in *Brodeur* was material to its conclusion that probable cause did not exist. Here, by contrast, the trial court's factual mistakes were not material. Accordingly, they do not require reversal.

Second, even if the trial court's factual mistakes were material, reversal would not necessarily follow. It is well settled that we may affirm the trial court's decision on any basis called for by the record. See People v. Greco, 204 Ill. 2d 400, 414 (2003); People v. Cleveland, 342 Ill. App. 3d 912, 915 (2003). Moreover, we may do so regardless of whether the trial court's reasoning was correct. See Toia v. People, 333 Ill. App. 3d 523, 527 (2002). This is because of the "long-standing principle that it is not the trial court's reasoning which is the subject of this court's review, but, rather, its judgment. *Cleveland*, 342 Ill. App. 3d at 915, quoting People v. Norks, 137 Ill. App. 3d 1078, 1082 1985 . This principle manifests itself in the applicable standard of review, under which we first review the trial court's factual findings, and then review de novo the trial court's legal conclusion in light of the correct facts. Thus, a trial court's making material mistakes of fact does not inevitably lead to its decision being reversed.

In sum, the vast majority of the trial court's factual findings were correct, but the trial court did make two factual findings that were against the manifest weight of the evidence. We reject both of those findings. Pitman, 211 Ill. 2d at 512. However, contrary to the State's suggestion, this does not mean that we must reject the trial court's ultimate legal conclusion. Rather, having ascertained the correct facts, we review the trial court's legal conclusion de novo. Sorenson, 196 Ill. 2d at 431.

### B. The Proper Framework for Our Analysis

Both the parties and the trial court analyzed the actions of the police under *Gonzalez*. In *Gonzalez*, the supreme court began by noting that a traffic stop is a seizure, and, as such, it must be carried out in a manner

consistent with the fourth amendment s protection against unreasonable search and seizure. *Gonzalez*, 204 Ill. 2d at 225-26. As discussed in part IB above, the *Gonzalez* court set out an analytical framework for courts to use in determining whether police questioning during a traffic stop seizure is consistent with those protections. *Gonzalez*, 204 Ill. 2d at 235. In particular, the court must first determine whether the initial stop passes constitutional muster. *Gonzalez*, 204 Ill. 2d at 228-29. If it does, the court must then determine whether police questioning during the stop exceeded the constitutionally permissible scope of the stop. *Gonzalez*, 204 Ill. 2d at 229. To do so, the court inquires whether, assuming the questioning was not related to the initial purpose of the stop or supported by a reasonable suspicion of additional criminal activity, the questioning either changed the fundamental nature of the stop or impermissibly prolonged its duration, or both. *Gonzalez*, 204 Ill. 2d at 235.

By its terms, the *Gonzalez* analysis cannot apply to a traffic stop that has ended--after all, how can a traffic stop be impermissibly prolonged if it is already over? According to the supreme court, a traffic stop seizure ends when the police issue either a warning or a traffic ticket to the driver and return his or her documentation  e.g., his or her insurance information and driver s license . See *People v. Brownlee*, 186 Ill. 2d 501, 520  1999 . At that point, the driver is no longer seized. Thus, if police questioning occurs after a traffic stop has ended, the constitutionality of that questioning cannot be analyzed under *Gonzalez*. See *People v. Bunch*, 207 Ill. 2d 7, 31  2003  Thomas, J., dissenting   Because the traffic stop in this particular case ended vis-a-vis defendant    there is no need to continue with a *Gonzalez* analysis under the circumstances presented here  . Instead, the court must inquire whether that questioning amounted to a second seizure. See *Brownlee*, 186 Ill. 2d at 517  inquiring whether police questioning following the conclusion of a traffic stop amounted to a seizure  *People v. Goeking*, 335 Ill. App. 3d 321, 323-24  2002  same . The questioning amounts to a seizure if, in light of the circumstances, a reasonable person would not feel free to leave. *Brownlee*, 186 Ill. 2d at 517, quoting *United States v. Mendenhall*, 446

U.S. 544, 554, 64 L. Ed. 2d 497, 509, 100 S. Ct. 1870, 1877 1980 . If a seizure occurs, and if the police lack a constitutional justification for that seizure, then the fourth amendment has been violated. See Brownlee, 186 Ill. 2d at 518, 520.

Here, the trial court considered the constitutionality of Investigator Weber s asking Mendoza if he had anything illegal in his car and if he would consent to a search of the car. Investigator Weber put these questions to Mendoza after Investigator Weber had returned Mendoza s license and insurance information and explained that no citation would be issued. That is to say, Investigator Weber put these questions to Mendoza after the traffic stop seizure had ended. See Brownlee, 186 Ill. 2d at 520. Therefore, the constitutionality of those questions cannot be measured with Gonzalez. The trial court and the parties were mistaken to believe otherwise.

That mistake is understandable given the confusion that surrounds this issue. For example, in Bunch, a police officer conducted a traffic stop of a vehicle in which the defendant was a passenger. Bunch, 207 Ill. 2d at 9. The officer arrested the driver for driving without a license then the officer ordered the defendant out of the car. After the defendant exited the vehicle, the officer asked him    What s your name? Where sic you coming from?    Bunch, 207 Ill. 2d at 10. While questioning the defendant, the officer shined his flashlight in the defendant s face. The officer observed in the defendant s mouth a clear plastic item, which turned out to be a bag of heroin. Bunch, 207 Ill. 2d at 10-11. At that point, the defendant was arrested and charged with possession of a controlled substance.

He filed a motion to suppress, which the trial court denied. On appeal, the appellate court reversed, and a divided supreme court affirmed the appellate court s judgment. Although the majority stated that the questioning of the defendant occurred  after the purpose of the stop was concluded   emphasis in original  Bunch, 207 Ill. 2d at 17 , the majority apparently believed that, at the time of the questioning, the stop itself was still ongoing. That this was the majority s belief is apparent from the fact that, at the beginning of its discussion, the

majority applied to the defendant s case the <u>G</u>onzalez analysis  <u>B</u>unch, 207 I<sub>ll.</sub> 2<sub>d</sub> at 15 , which, as discussed above, applies to police conduct only if that conduct occurs during a traffic stop  see <u>G</u>onzalez, 207 I<sub>ll.</sub> 2<sub>d</sub> at 235 . <u>A</u>pplying <u>G</u>onzalez, the majority found, among other things, that the officer s questioning of the defendant had impermissibly prolonged the duration of the traffic stop. <u>B</u>unch, 207 I<sub>ll.</sub> 2<sub>d</sub> at 17. <u>T</u>hus, the majority concluded that the questioning violated the fourth amendment.

The majority s analysis did not end there, however. After concluding that, under <u>G</u>onzalez, the officer had impermissibly prolonged the traffic stop, the majority went on to address the State s argument that  the initial detention of defendant, incidental to the stop of the vehicle, ended when defendant exited the car  and that what followed  was a consensual conversation between defendant and the officer.  <u>B</u>unch, 207 I<sub>ll.</sub> 2<sub>d</sub> at 17. The majority stated that it  disagree d   with this argument. <u>B</u>unch, 207 I<sub>ll.</sub> 2<sub>d</sub> at 17. But it did not state what part it disagreed with.  That is, the majority did not explain whether it rejected the State s contention that the traffic stop had ended, or whether it accepted that contention and rejected the State s contention that a consensual encounter followed, or whether it rejected both of those contentions.

Apparently, however, the majority accepted the State s contention that the traffic stop had ended before the questioning began.  This is apparent because the majority went on to consider the State s follow-up contention, i.e., whether, at the time of the questioning, the defendant was engaged in a consensual encounter with the officer. <u>B</u>unch, 207 I<sub>ll.</sub> 2<sub>d</sub> at 17-19. <u>A</u>pplying <u>B</u>rownlee--a case that involved an encounter following the end of a traffic stop--the majority concluded that a reasonable person in the defendant s position would not have felt free to leave, and, therefore, the encounter was not consensual. <u>R</u>ather, it was a seizure. <u>S</u>ee <u>B</u>unch, 207 I<sub>ll.</sub> 2<sub>d</sub> at 19.  <u>O</u>f course this line of analysis makes sense only if, at the time of the officer s questioning of the defendant, the traffic stop had already ended.  <u>T</u>his is because, even casting aside the fact that <u>B</u>rownlee involved an after-traffic-stop encounter, there is the well-established rule that a traffic stop is a seizure  <u>W</u>hren, 517 U.S. at 809-10, 135 L. e<sub>d.</sub> 2<sub>d</sub> at 95, 116 S. C<sub>t.</sub> at 1772 .  I<sub>f</sub>

the traffic stop were ongoing at the time of the questioning, there would have been no need to consider whether a reasonable person in the defendant's position would have felt free to leave, that is, whether the defendant was seized. One cannot be seized and unseized at the same time. The *Bunch* majority concluded that the defendant had been seized. Because that seizure was not supported by reasonable suspicion, the majority found that the officer's conduct violated the fourth amendment. See *Bunch*, 207 Ill. 2d at 20.

Justice Thomas dissented. He stated that the majority's "summary conclusion" that the traffic stop was "impermissibly prolonged" begs the real issue in this case--whether the initial seizure at the time of the stop had "dissipated into a nonseizure" when the officer started asking questions of the defendant. *Bunch*, 207 Ill. 2d at 30 (Thomas, J., dissenting). Because Justice Thomas concluded that it had, he further concluded that the majority erred in continuing to apply the *Gonzalez* framework after that point. Justice Thomas stated that, once the encounter dissipated into a nonseizure, the question became whether what followed was a second seizure or a consensual encounter. *Bunch*, 207 Ill. 2d at 31 (Thomas, J., dissenting). Justice Thomas concluded that it was a consensual encounter. Accordingly, he would have reversed the granting of the motion to suppress. See *Bunch*, 207 Ill. 2d at 33 (Thomas, J., dissenting).

In the wake of the supreme court's decision in *Bunch*, the appellate court has had difficulty determining when to apply *Gonzalez*. In some cases, the appellate court has properly applied *Gonzalez* only if, at the time of the challenged police questioning, the traffic stop was still ongoing. See People v. Sloup, 359 Ill. App. 3d 841 (2005); People v. Matthews, 357 Ill. App. 3d 1062 (2005); *Parra*, 352 Ill. App. 3d 584. In other cases, however, the appellate court has applied *Gonzalez* even though the challenged questioning occurred after the stop had ended. See People v. Heather, 351 Ill. App. 3d 1052 (2004); *People v. Hall*, 351 Ill. App. 3d 501 (2004); People v. Roberts, 349 Ill. App. 3d 972 (2004). And, in at least one case involving a post-traffic-stop encounter, the appellate court has set out the *Gonzalez* framework and then, without applying all of that framework, concluded that, because a reasonable person in the defendant's

position would have felt free to leave, no seizure occurred. See People v. Ramsey, 362 Ill. App. 3d 610, 617 2005 . In short, following Bunch, it has been hard to figure out when Gonzalez applies.

That said, we are sure it does not apply here. The trial court found improper Investigator Weber s asking Mendoza if he had anything illegal in his car and if the police could search it. Investigator Weber put these questions to Mendoza after returning his insurance information and driver s license and explaining that no citation would be issued. According to the supreme court, these actions ended the traffic stop. Brownlee, 186 Ill. 2d at 520. And, as explained, Gonzalez cannot apply after a traffic stop has ended.

Of course one might argue that Bunch requires us to apply Gonzalez even though the traffic stop here had ended before the questioning began. But we would disagree. To be sure, the Bunch majority appeared to conclude both that the traffic stop had not ended--and that, therefore, Gonzalez applied--and that the traffic stop had ended and the question was whether the defendant was reseized. However, we are unwilling to ascribe such an internally contradictory thinking to the Bunch majority. Instead, as we see it, the Bunch majority first concluded that, while the purpose of the traffic stop had ended, the traffic stop itself had not. Bunch, 207 Ill. 2d at 17. Accordingly, it applied Gonzalez. Bunch, 207 Ill. 2d at 15. Then, in response to the State s argument that the traffic stop itself had ended and had been followed by a consensual encounter, the Bunch majority concluded that, even assuming, arguendo, the traffic stop had ended, the officer s actions still would have violated the fourth amendment. This was so, the majority reasoned, because the officer s actions would have constituted a second seizure. Bunch, 207 Ill. 2d at 19.

Here, there is no dispute  the questioning of Mendoza occurred after his documents had been returned and after he was informed that no citation would be issued. Because this means the questioning occurred after the traffic stop had ended, the inquiry is not whether the questioning was proper under Gonzalez. Instead, the inquiry is   I  did Investigator Weber s questioning of Mendoza following the completion of the traffic stop

˘18˘

amount to a second seizure of Mendoza? If so, 2 was the reseizure constitutionally justified? We turn now to tackle this inquiry.

### C. Applying the Proper Analysis to this Case

The first question is whether Investigator Weber s post-traffic-stop questioning of Mendoza amounted to a seizure. A seizure occurs "when, by means of physical force or a show of authority, a person s freedom of movement is restrained." Brownlee, 186 Ill. 2d at 517, quoting Mendenhall, 446 U.S. at 553, 64 L. Ed. 2d at 509, 100 S. Ct. at 1877. As noted in part IIB above, to determine whether a seizure has occurred, we must consider whether "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." Brownlee, 186 Ill. 2d at 517, quoting Mendenhall, 446 U.S. at 554, 64 L. Ed. 2d at 509, 100 S. Ct. at 1877. This is a practical, realistic inquiry, and, in undertaking it, we must be guided by common sense. See People v. Luedemann, 357 Ill. App. 3d 411, 421 2005 .

Here, the circumstances were as follows. It was late at night and two officers had stopped Mendoza. After taking his insurance information and driver s license, the officers returned to their vehicle then they again approached Mendoza s car. They did so using a flanking maneuver. Both officers were dressed in dark, special operations uniforms and their guns were visible. Investigator Weber returned Mendoza s documents and said no ticket would be issued, but no sooner had he done so than he began asking about illegal items in Mendoza s car. When Mendoza told Investigator Weber that there was nothing illegal in the car, Investigator Weber did not accept this answer he asked to search the car. Meanwhile, Investigator Wiencek shined his flashlight into the car. Taking a commonsense view of these circumstances, we cannot say that a reasonable person in Mendoza s position would have felt free to leave. See Brownlee, 186 Ill. 2d at 517 Luedemann, 357 Ill. App. 3d at 421. Instead, a reasonable person in this situation would likely conclude that, if he or she drove

away, then the two officers would soon be in hot pursuit. *Brownlee*, 186 Ill. 2d at 520. Thus, Mendoza was seized.

We find support for this conclusion in our decision in *Goeking*, 335 Ill. App. 3d 321. There, a police officer conducted a traffic stop of the defendant's car after the defendant failed to signal before pulling away from a curb. Because the defendant's eyes were "glossy" and "bloodshot," the officer suspected that she might be under the influence of alcohol. *Goeking*, 335 Ill. App. 3d at 322. To investigate this possibility, the officer had the defendant step out of the vehicle, but the officer soon concluded that the defendant was not intoxicated and issued her a verbal warning and told her she could go. Then, as she started towards her car, the officer asked her if she had anything illegal in the car. Specifically, the officer asked if she had any "knives, guns, drugs, dead bodies, grenades, rocket launchers, anything that shouldn't be in the vehicle." *Goeking*, 335 Ill. App. 3d at 322. The defendant said no, and the officer asked for permission to search the car. The defendant gave permission, and the officer conducted a search of the car, which turned up a pen and a socket wrench that both contained drug residue. *Goeking*, 335 Ill. App. 3d at 322-23. We found that, prior to giving her consent to search, the defendant had been seized. In doing so, we reasoned that under the circumstances a reasonable person in the defendant's position would not have felt free to leave. *Goeking*, 335 Ill. App. 3d at 324. Accordingly, we affirmed the decision of the trial court, which had suppressed the items recovered from the defendant's car.

The same result is proper here. As discussed above, the officers' conduct would have communicated to a reasonable person in Mendoza's position that he or she was not free to leave. Thus, here, as in *Goeking*, a seizure occurred.

Indeed, two aspects of this case make it even more compelling than *Goeking*. First, here, unlike in *Goeking*, Investigator Weber did not tell Mendoza that he was free to leave before pursuing further questioning. Although an encounter may be consensual absent a driver's being told that he or she is free to leave

*see* *Ohio v. Robinette*, 519 U.S. 33, 136 L. Ed. 2d 347, 117 S. Ct. 417 1996 , this is still a factor to consider in determining whether a seizure has occurred  see *People v. LaPoint*, 353 Ill. App. 3d 328, 333 2004 . For this reason, we find this case even more compelling than *Goeking*. Second, here, unlike in *Goeking*, there was more than one officer present. The presence of multiple officers weighs against a finding that a reasonable person in the defendant s position would have felt free to leave. See *Mendenhall*, 446 U.S. at 554, 64 L. Ed. 2d at 509, 100 S. Ct. at 1877. That is, it weighs in favor of a finding that the defendant was seized. For this reason too, we find this case even more compelling than *Goeking*.

The presence of multiple officers distinguishes this case from *Ramsey*, 362 Ill. App. 3d 610. In that case, a divided panel of the Fourth District found that an officer s post-traffic-stop questioning of the defendant did not amount to a seizure. However, in *Ramsey*, unlike in the present case, only one officer was involved. And, in finding that no seizure had occurred, the court specifically noted this fact. See *Ramsey*, 362 Ill. App. 3d at 620. Therefore, *Ramsey* does not undermine the conclusion that a seizure occurred here.

Having concluded that a seizure occurred, we must consider whether it was justified. Under the fourth amendment, a seizure is justified if it is reasonable. See *Brownlee*, 186 Ill. 2d at 517-18. Reasonableness generally requires a warrant supported by probable cause. *People v. Love*, 199 Ill. 2d 269, 275 2002 . However, there are exceptions to the warrant requirement. One exception allows police to seize an individual if the officers can point to specific, articulable facts that, when combined with the rational inferences derived from those facts, provide reasonable suspicion that the person seized has committed or is about to commit a crime. *Village of Mundelein v. Thompson*, 341 Ill. App. 3d 842, 848 2003 . The facts supporting reasonable suspicion do not need to constitute probable cause. *People v.*

*Holland*, 356 Ill. App. 3d 150, 154 (2005). However, they must lead to more than a mere hunch. *People v. Lampitok*, 207 Ill. 2d 231, 255 (2003).

The State argues that the post-traffic-stop questioning of Mendoza--that is, the second seizure--was justified because the officers reasonably suspected that Mendoza had something illegal in his car. The State bases this conclusion on the following facts: (1) Mendoza was caught driving in Aurora; (2) gang activity, including shootings, had occurred in Aurora; (3) Mendoza had in his car a red bandana, which might have been a signal of gang affiliation; and (4) the officers had information --including the fact that Mendoza had previously been seen in the same place as gang members--that Mendoza was affiliated with a gang. Based on these facts, the State argues that the officers had reasonable suspicion. Thus, the State argues, the seizure was justified.

The State's argument is without merit. To begin with, the fact that Aurora is an area where gang activity has occurred cannot possibly form the basis for reasonable suspicion; if it could, the police would be justified in seizing on suspicion of being involved in illegal activity anyone seen driving in the city of Aurora. This is obviously unacceptable. For its part, the State has pointed to no case holding that an individual's mere presence in a city gives police reasonable suspicion to believe that the individual is up to something illegal. Nor could it. See *Illinois v. Wardlow*, 528 U.S. 119, 124, 145 L. Ed. 2d 570, 576, 120 S. Ct. 673, 676 (2000) ("An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime"). Therefore, Mendoza's presence in Aurora did not give the officers a reasonable suspicion of criminal activity. The fact that Mendoza had hanging from his rearview mirror a red bandana changes nothing; plenty of non-gang members hang things from their rearview mirrors, and some of these items are bound to be red. Of course, the State argues that, in this case, the officers actually had "information" that Mendoza was a gang "affiliate." This does not alter our conclusion. As much as it might be socially distasteful to the average citizen, a person's

hanging out with gang members is not a crime. Unless, of course, that person is hanging out with gang members while they are committing a crime, but there is no evidence that the police believed that to be the case here. In short, the officers had no information that gave them reasonable suspicion of some specific criminal activity. Accordingly, their seizure of Mendoza was improper. See Lampitok, 207 Ill. 2d at 255.

We find support for this conclusion in Parra, which, although it properly addressed the reasonable suspicion question in the context of a Gonzalez analysis, provides guidance on this point. In Parra, a police officer conducted a vehicle stop of the defendant. The stop occurred in an area of high gang activity. Parra, 352 Ill. App. 3d at 586. When the officer made contact with the defendant, the officer saw in the defendant s wallet a firearm owner s identification FOID card and in his glove compartment several latex gloves. The officer was aware that latex gloves had been used in recent gang crimes involving handguns. Parra, 352 Ill. App. 3d at 585-86. Based on this information, the State argued that the officer had a reasonable suspicion of criminal activity. We disagreed. In doing so, we noted that law-abiding citizens often carry FOID cards and that latex gloves are facially innocuous. See Parra, 352 Ill. App. 3d at 588.

Likewise, in the present case, the red bandana in Mendoza s car was facially innocuous. So, too, is the fact that he was stopped while driving in Aurora. At the same time, as the State points out, here, unlike in Parra, the officers had information linking Mendoza to a gang. However, as we have already explained, that is not a big enough hook on which to hang reasonable suspicion. Thus, here, as in Parra, the officers did not have reasonable suspicion.

The State makes two unconvincing attempts to distinguish Parra. First, the State argues that, unlike the latex gloves the officer in Parra saw in the defendant s car, the gun Investigator Wiencek saw in Mendoza s car was not facially innocuous. The problem with this argument is that Investigator Wiencek did not see the gun until after Mendoza was seized. Before that, Investigator Wiencek and Investigator Weber saw only the red bandana, which, like the gloves in Parra, was facially innocuous. Therefore, this argument is

without merit. Second, the State argues that, unlike in <u>Parra</u>, the officers here said they felt a heightened need for safety. We agree with the State that this is a distinction between this case and <u>Parra</u>. But it is a distinction without a difference. Although we recognize the need for officers to take safety precautions when dealing with the unsavory characters they sometimes encounter on the street, this need alone cannot turn something that does not amount to reasonable suspicion into something that does. Nor can it justify an intrusion for which the police do not have a constitutional justification. As we have recently explained

Police safety is certainly a legitimate concern. It does not, however, immunize from constitutional scrutiny all actions taken in its name. If, in the name of officer safety, an officer chooses to take certain actions that amount to a seizure, that may be understandable under certain circumstances. However, if those actions are taken absent some justification for a seizure, the State is not entitled to utilize their fruits in a criminal prosecution. <u>Luedemann</u>, 357 Ill. App. 3d at 423.

The same is true in this case.

To summarize, because a reasonable person in Mendoza s position would not have felt free to leave when Investigator Weber continued questioning him after the conclusion of the traffic stop, Mendoza was seized. That seizure was not supported by reasonable suspicion of criminal activity. And that seizure led directly to the discovery of the evidence against Mendoza. Thus, the trial court did not err in granting Mendoza s motion to suppress.

## III. CONCLUSION

For the reasons stated, the judgment of the circuit court of Kane County is affirmed.

Affirmed.

GROMETER, P.J., and CALLUM, J., concur.